525 A.2d 255

**Marcia A. BURNS, et vir.**

v.

**MAYOR AND CITY COUNCIL OF ROCKVILLE, Maryland.**

**No. 947, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

May 11, 1987.

Robert Earl Wilson, Upper Marlboro, for appellants.

Joann Robertson, Sr. Asst. Co. Atty., Rockville (Paul A. McGuckian, Co. Atty., Rockville, on the brief), for appellee.

Argued Before WEANT, ROSALYN B. BELL and ROBERT M. BELL, JJ.

ROSALYN B. BELL, Judge.

Marcia Burns and her husband, appellants, challenge the award of summary judgment against them in favor of the Mayor and City Council of Rockville (Rockville), appellees. Specifically, the Burnses contend:

"I.   The Circuit Court erred in granting [the] Motion for Summary Judgment because there existed a genuine dispute as to material facts between the parties.

"II.   The Circuit Court erred in granting [the] Motion for Summary Judgment because the [appellee] was engaged in a 'proprietary function,' and, therefore the defense of sovereign immunity does not lie.

"III.   The Circuit Court erred in granting [the] Motion for Summary Judgment because, to the extent applicable, the defense of sovereign immunity has been waived by the [appellee].

"IV.   The Circuit Court erred in granting [the] Motion for Summary Judgment because the doctrine of sovereign immunity, as applied to municipal corporations and the distinction between governmental and proprietary functions is unconstitutional."

The underlying facts are essentially undisputed. Marcia Burns arrived at a performance to be given by The Rockville Civic Ballet on December 13, 1981 at the F. Scott Fitzgerald Theater located in the Rockville Civic Center. Burns entered the small theater on the left side but was unable to locate available seats. Observing open seats on the right side of the theater, Burns chose to walk directly in front of the stage area rather than retreat up the left aisle, through the exit doors, and down the right or center aisle.

As she was crossing from the left aisle to the right aisle, she stepped into the orchestra area, which was depressed 10 to 12 inches. Burns misgauged the depth of the step and fell, suffering ankle and leg injuries.

Burns and her husband filed suit in the Circuit Court for Montgomery County against Rockville alleging that the orchestra "pit," as they referred to it, was a dangerous condition which Rockville knew or should have known about and that Rockville was negligent in failing to provide warning signs, steps, barriers or contrasting colored carpet to warn business invitees of the lowered area. Rockville answered the complaint by pleading that it was not negligent and that Marcia Burns was contributorily negligent and assumed the risk of injury. Rockville subsequently filed a Motion for Summary Judgment alleging it was immune from suit under the doctrine of governmental immunity. The court agreed and judgment was entered accordingly.

In reviewing an award of summary judgment, the movant must have clearly demonstrated the absence of any genuine issue of material fact and must also have demonstrated that he or she is entitled to summary judgment as a matter of law. *Castiglione v. Johns Hopkins Hospital,* 69 Md.App. 325, 332, 517 A.2d 786 (1986). The purpose of a summary judgment hearing is not to determine disputed facts but to determine whether a genuine dispute as to any material fact exists. Moreover, the court may not attempt to decide any issue of credibility. *Coffey v. Derby Steel Co.,* 291 Md. 241, 247, 434 A.2d 564 (1981). In determining whether a factual dispute exists, all inferences to be drawn from the pleadings, affidavits and admissions must be resolved against the moving party. *Delia v. Berkey,* 41 Md.App. 47, 51, 395 A.2d 1189 (1978), *aff'd,* 287 Md. 302, 413 A.2d 170 (1980). "[E]ven where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact." *Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138, 265 A.2d 256 (1970). Even if it is found unlikely that

the party opposing the motion will prevail at trial, the motion should not necessarily be granted against that party. *Delia,* 41 Md.App. at 51, 395 A.2d 1189.

The summary judgment was based on the conclusion that when the Rockville Civic Ballet performed on December 13, 1981, Rockville was engaged in a governmental as opposed to a proprietary function and thus the doctrine of immunity barred the Burnses' recovery.

Recently, the Court of Appeals discussed immunity available to the State and to municipalities in *Maryland-National Capital Park and Planning Commission v. Kranz,* 308 Md. 618, 521 A.2d 729 (1987). We quote:

"As this Court has often pointed out, the doctrine that the State of Maryland and state agencies are generally immune from suits, unless the immunity has been waived by the General Assembly, ' "is firmly embedded in the law of Maryland." ' *Austin v. City of Baltimore,* 286 Md. 51, 53, 405 A.2d 255 (1979), quoting *Katz v. Wash. Suburban Sanitary Comm'n,* 284 Md. 503, 507, 397 A.2d 1027 (1979). On the other hand, counties and municipalities do not possess this general immunity. Instead, counties and muncipalities have never been given immunity in contract actions, and, in tort actions, they are not immune with regard to those matters categorized as 'proprietary' but are immune with regard to those matters categorized as 'governmental.' *See generally, e.g., Tadjer v. Montgomery County,* 300 Md. 539, 546–550, 479 A.2d 1321 (1984); *Austin v. City of Baltimore, supra,* 286 Md. at 58–61, 63–66 (majority opinion), 70–78 (concurring and dissenting opinion), 83–84 [405 A.2d 255] (dissenting opinion); *Katz v. Washington Sub. San. Comm'n supra,* 284 Md. at 507–512, 397 A.2d 1027]; *Bradshaw v. Prince George's County, supra,* 284 Md. [294] at 300 [396 A.2d 255] [(1979)]; *American Structures v. City of Baltimore,* 278 Md. 356, 358–360, 364 A.2d 55 (1976); *Cox v. Anne Arundel County,* 181 Md. 428, 431–433, 31 A.2d 179 (1943)."

Traditionally, the immunity attaching to the State was referred to as sovereign immunity while that available to

municipalities was referred to as governmental immunity. In *Kranz*, the Court, however, emasculated the semantic distinction between the terms, noting that the cases more often than not used the terms interchangeably.

As stated, municipal immunity is not automatic, but when the municipality or county is engaged in a governmental function, immunity attaches. *Mayor of Baltimore v. State, ex rel. Blueford*, 173 Md. 267, 271–72, 195 A. 571 (1937). The Court of Appeals in *Blueford*, 173 Md. at 276, 195 A. 571, outlined the test for determining whether a municipality is engaged in a governmental function as follows:

"Where the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the public health and promote the welfare of the whole public, and has in it no element of private interest, it is governmental in its nature."

Further clarifying this test in *Tadjer v. Montgomery County*, 300 Md. 539, 547, 479 A.2d 1321 (1984), the Court of Appeals explained:

"Another way of expressing the test ... is whether the act performed is for the common good of all or for the special benefit or profit of the corporate entity."

Thus, the essential question presented before the circuit court was whether Rockville was performing a governmental function when Marcia Burns was injured.

To support its position that the presentation of a ballet was governmental, Rockville submitted the affidavit of Betty Cheslowsky Wisda, supervisor of the Arts and Special Programs Division of the Department of Recreation and Parks of the City of Rockville. She indicated that the Rockville Civic Ballet was a part of her division. She also stated that the fee and ticket pricing policy of Rockville regarding the Ballet "neither anticipated to, nor [did] they,

cover the cost of running the Ballet." [1]   She set forth the receipts and expenses of the Ballet for fiscal years 1982–1985 which showed a net loss of between $1,193 and $1,799 a year.   Rockville also submitted the affidavit of Mary Parker, Director of Finance for the City of Rockville, in which she indicated that for fiscal year 1982, in the general fund, there were funds appropriated to run the Rockville Civic Ballet and that therefore, the Ballet was an authorized city expenditure.

Applying the tests set out in *Blueford* and *Tadjer*, the circuit court agreed with Rockville that the Ballet was legislatively authorized, was solely for public enjoyment and was not a profit-making enterprise for the city, benefited the public welfare and had no element of private interest. Accordingly, the court ruled that Rockville was protected by municipal immunity.

## I.  FACTUAL  DISPUTE

Focusing on the profit element set out in *Blueford,* the Burnses first assert the court erred in granting summary judgment because a genuine dispute as to a material fact existed.[2]   Referring to Wisda's affidavit, they argue that several items of expense should not have been included in determining the Ballet's profitability and thus whether the Ballet made a profit was a material factual question in dispute.

---

1.  At oral argument, counsel for Rockville stated that the cost of a ticket to one of the Ballet's performances was $1.50.

2.  Neither party has raised the issue of the application of Rule 2–322(c).   Rule 2–322(c) provides that the defense of governmental immunity may be raised in a preliminary motion to dismiss and, if so, "shall be determined before trial. . . ."   This inferentially suggests that the issue of immunity will always be decided by the court rather than by a jury even if a factual issue is generated.   This is further supported by another provision in the same Rule which singles out the defense of failure to state a claim and states that, if a factual issue is raised with respect to a motion to dismiss for failure to state a claim, only then do the rules for summary judgment apply.   Since the parties did not raise this issue, we do not decide it.

We note that the Burnses presented this issue in their written motion opposing summary judgment, but at the hearing, counsel did not address this issue except for a passing reference to it as a "minor" factual dispute concerning profitability. Somehow, this "minor" factual dispute has been transformed into a material factual dispute on appeal.

Included in Wisda's affidavit were expenses for "[f]acilities [r]ental of [r]ehearsal [s]pace"; "[s]torage [a]rea/[t]ech [q]uarters"; and [f]acility [r]ental of [t]heatre." The affidavit then stated with respect to these items:

> "7. That the valuation of the facility rental and storage/technical quarters is based upon a comparison of fees charged to other users of these facilities. There is no actual charge to the Civic Ballet for the use of these facilities, but, instead, the cost to the City of Rockville has been determined using this comparison method."

The Burnses assert that without inclusion of those expenses, the Ballet operated at a profit. This argument failed to convince the trial judge and fails to convince this Court of the existence of a material fact for several reasons.

Relying on *Tadjer*, the Burnses argue that whether an activity operates at a profit is a question that can only be resolved by a trial on the merits. It is true in *Tadjer*, 300 Md. at 549–50, 479 A.2d 1321, the Court of Appeals ruled that whether expenses for a county landfill were in excess of the revenues derived was a factual question:

> "If, as in *Austin* [*v. Mayor of Baltimore*, 286 Md. 51, 405 A.2d 255 (1979)] and [*Blueford*], the income was not adequate to maintain the landfill or if this income were barely adequate to cover expenses, we would agree that this landfill operation was a governmental function. On the other hand, if the income derived was in an amount substantially in excess of the County's expenses for rent, operation and the like, so that the landfill was a real moneymaking proposition, it would be a proprietary func-

tion. *Only a trial on its merits can make this determination."* (Emphasis supplied).

In this regard, we find *Tadjer* distinguishable from the case *sub judice.* In *Tadjer,* the trial court granted a demurrer to a plaintiff's claim for negligence against Montgomery County based on immunity. The *Tadjer* Court reversed the trial court and this Court because there was no evidence before either court about the amount of expenses and revenues derived from the landfill:

"All we have is the fact set forth in the declarations that the County derived 'substantial income' from this operation. We, of course, have no way of knowing the amount of this income. It may be great or small."

*Tadjer,* 300 Md. at 549, 479 A.2d 1321. Unlike *Tadjer,* this Court has before it the expense and income figures for the Ballet, and thus this case is governed by the holding in *Blueford* where the Court was able to determine that the operation of a swimming pool was not a profit-making proposition. *See also Wright v. Rever,* 151 Md. 558, 568, 136 A. 61 (1926).

■ More important, the issue challenged in the case at bar is not a factual question. The Burnses do not dispute the numerical expense and revenue calculations provided in Wisda's affidavit. Of utmost importance to the case *sub judice,* they do not contest that the figures provided were not the actual costs to Rockville for providing the space used by the Ballet. In an unverified opposition to the motion for summary judgment, the Burnses merely alleged that the challenged expenses were "not actually paid or incurred by the City of Rockville and therefore should not be considered in determining the ballet's profitability." No affidavit was filed to support this claim. *Cf. Frush v. Brooks,* 204 Md. 315, 320–22, 104 A.2d 624 (1954) (mere denial of a claim is conclusory and ineffectual to bar motion for summary judgment supported by valid affidavit). Had the Burnses challenged the figures and/or produced an affidavit which stated that the challenged expenses were not charged to other users or were not proper accounting

expenses, a material factual issue may have been generated. Instead, they have merely presented the trial court with a conclusion. The Burnses did not generate a factual question about whether the expenses should be utilized. They raised no issue of credibility.

■ In any event, even if we accepted their argument that the rental and storage fees should not be used in calculating expenses, there still is no question but that the Ballet was not a moneymaking proposition. If we omit the challenged expenses from the expense calculation as the Burnses desire, the Ballet still operated either at a loss or a slight gain for all four years noted in Wisda's affidavit. In an effort to alleviate its losses, the Ballet held bake and craft sales. The holding of bake and craft sales to generate sufficient income to allow the Ballet to "break even" does not convert an otherwise losing proposition into a profit-making one. Moreover, bake and craft sales are not activities generally engaged in by organizations that are designed to and anticipate making a profit. Moreover, the fact that the Ballet may have received some revenue gain for some of the years of its operation from a balance sheet point of view does not automatically mean it was designed as, and operates as, a profit-making activity. We find this situation governed under the rationale set out in *Austin*, 286 Md. at 66, 405 A.2d 255:

> "Although the fees projected when the Camp Cahill budget was proposed may have generated sufficient funds to cover day-to-day expenses of the camp, it is 'obvious', as the Court of Special Appeals ascertained, 'that the City had a substantial capital investment in the Camp Cahill Recreation Center, and that it was required to subsidize the day-to-day operation of the Center and the day camp.' We believe, as the intermediate appellate court believed, that the fees here did not result in a profit or emolument inuring to the City within the contemplation of the *Blueford* guidelines." (Citation omitted.)

Wisda's affidavit further stated that the Ballet also received, without an allocation of costs from Rockville, admin-

istrative support including "publicity, graphic requests, advanced ticket sales, and budget items"; "[t]echnical support from the City's technical director/electrician in the areas of light design/execution, set designs/construction and sound execution"; "[s]ecretarial staff, custodial staff, and the services of the civic center supervisor and the graphics department." No figures were provided for the cost to Rockville for these items and they were not figured into the fiscal years' expense calculations. It is clear, thus, that Rockville subsidized the Ballet in its day-to-day operations to an extent greater than that reflected in the expense calculations. In conclusion, we hold the trial court did not err in concluding the Ballet did not operate at a profit to Rockville.

## II. GOVERNMENTAL OR PROPRIETARY FUNCTION

The Burnses next allege that Rockville was engaged in a proprietary function and thus the doctrine of municipal immunity is inapplicable. Focusing on the test set out in *Blueford*, they argue that the activity did not benefit the public health and promote the public welfare and that it had an element of private interest.

The Burnses specifically posit that the activity Rockville engaged in was not the maintenance of a municipal recreation program, but the ownership and maintenance of property: "[Rockville] was sued in its *purely proprietary capacity as a land owner*." (Emphasis in original.) To support their position, the Burnses point out that the negligence they complained of was not in the performance of the Ballet, but instead was incident to the maintenance of property, specifically, a dangerously designed and maintained orchestra area. As they continue,

"it is not a necessary function of the sovereign to either own theaters or to produce ballet. One must stretch the common law and the doctrine of sovereign immunity to absurd lengths to find that the ownership of theaters or the production of ballets is a sufficient governmental

function to entitle [Rockville] the protection of the doctrine of sovereign immunity."

We disagree.

In *Austin,* the Court of Appeals established that municipal recreation programs were governmental in nature. In that case, the Department of Recreation and Parks of the City of Baltimore operated a day camp, Camp Cahill, for underprivileged inner-city children. The mother of a young girl, who drowned during a camp field trip, sued the City of Baltimore, but was barred by the doctrine of municipal immunity. The Court stated:

> " '[P]ublic parks are vitally necessary to the public health and welfare, in the congested centers of population, in affording a temporary escape from the noise and dust and jostling of crowded city streets. So, too, swimming or wading pools and other public facilities for bathing have a direct and necessary relation to the public health in affording to the masses who are unable to go to the seashore or to inland lakes, or ponds or streams beyond the city, some opportunity of lessening the dangers and discomforts which are inseparable from the depressing and exhausting heat of the summer season.' "

*Austin,* 286 Md. at 63–64, 405 A.2d 255, quoting *Blueford,* 173 Md. at 274, 195 A. 571. The Court concluded:

> " 'The City's election to furnish the day camp facilities to its citizens was a permitted exercise of its judgment as to the necessity for the program in the interest of the health, welfare and education of its children. To deny the City the protection of its cloak of [municipal] immunity in the operation of an activity necessary to the health, education and welfare of its children must have a chilling effect on the ability and willingness of the City to continue to furnish that vitally needed service in the future.' "

*Austin,* 286 Md. at 66, 405 A.2d 255, quoting *Mayor of Baltimore v. Austin,* 40 Md.App. 557, 572, 392 A.2d 1140 (1978). The Burnses, in essence, urge this Court to distinguish the ruling in *Austin* because the maintenance of the civic center for, among other things, the production of a

ballet is not socially equivalent to providing a day camp for "underprivileged, poverty-stricken children" and because the compelling need for governmental immunity is absent in the case *sub judice.* Although a sympathetic argument, we decline to adopt it. While the maintenance of a day camp serves a compelling need, the maintenance of other municipal recreation programs geared to other groups of citizens does so as well.

The Burnses are attempting to separate the recreational program of ballet conducted within the civic center building from the maintenance of the building in which the recreational program is conducted. In other words, they are taking a single municipal activity and dividing it into two components, one governmental and one proprietary. This strategy to isolate the activity from the facility was proposed and rejected in *Austin,* 286 Md. at 60, 405 A.2d 255:

> "Mrs. Austin suggests that we adopt the test set out by the Supreme Court of Michigan in *Pichette v. Manistique Public Schools,* 403 Mich. 268, 269 N.W.2d 143 (1978). Boiled down, this test recognizes as governmental the decision to perform a function and as proprietary the actual performance of the function. That is, deciding whether to operate and supervise a playground or swimming pool is a governmental function, but the operation and supervision of the playground and swimming pool comprises a proprietary function. In practical effect, this test abrogates, to all intent and purpose, the doctrine of sovereign or governmental immunity...."

To support their position, the Burnses cite the Ohio case of *Eversole v. City of Columbus,* 169 Ohio St. 205, 158 N.E.2d 515 (1959), and the Michigan case of *Dohm v. Township of Acme,* 354 Mich. 447, 93 N.W.2d 323 (1958). Not only is foreign case law not controlling in this jurisdiction, but we find these cases distinguishable from the situation *sub judice.*

In *Eversole,* a plaintiff enrolled as a student in a municipal arts and crafts school organized by the City of Columbus. While using the arts and crafts center, the plaintiff

entered a closet and fell down an unlit stairway sustaining injuries. The plaintiff sued Columbus and the City answered asserting the school was a governmental service. The *Eversole* Court disagreed and quoted the "most comprehensive decision" in Ohio for distinguishing between governmental and proprietary functions:

> " 'In performing those duties which are imposed upon the state as obligations of sovereignty, such as protection from crime, or fires, or contagion, or preserving the peace and health of citizens and protecting their property, it is settled that the function is governmental, and if the municipality undertakes the performance of those functions, whether voluntarily or by legislative imposition, the municipality becomes an arm of sovereignty and a governmental agency and is entitled to that immunity from liability which is enjoyed by the state itself. If, on the other hand, there is no obligation on the part of the municipality to perform them, but it does in fact do so for the comfort and convenience of its citizens, for which the city is directly compensated by levying assessments upon property, or where it is indirectly benefited by growth and prosperity of the city and its inhabitants, and the city has an election whether to do or omit to do those acts, the function is private and proprietary.' "

*Eversole*, 158 N.E.2d at 517–18, quoting *City of Wooster v. Arbenz*, 116 Ohio St. 281, 156 N.E. 210 (1927). The Ohio Court then ruled that since the City of Columbus voluntarily established and maintained the arts and crafts center for the benefit of those citizens who might be interested, the function was proprietary.

In contrast, the test to distinguish between proprietary and governmental functions in Maryland is different than that in Ohio—*Austin* recognizes that municipal recreation programs are governmental services. Moreover, the Court itself in *Eversole* recognized the inconsistency in Ohio case law concerning municipalities and immunity and provided no rationale for its decision other than that the voluntary establishment of a program created a proprietary function.

In *Dohm,* a plaintiff who attended an anniversary cele-
bration in a rented hall in a municipal building was injured
when she fell down allegedly dimly lit steps. The Supreme
Court of Michigan determined that the Village of Acme was
not engaged in a governmental service when it rented the
hall:

> "Obviously the use of the hall for the holding of an
> anniversary party of the character here involved had no
> connection with the exercise of any governmental func-
> tion. It was a purely private transaction and of the
> character that the owner of a building adapted to the
> holding of such gatherings might enter.... The amount
> of rental charged is not of controlling significance. The
> determining factor is the nature and purpose of the use
> on the occasion of the injury suffered by [plaintiff]."

*Dohm,* 93 N.W.2d at 327–28. We are perplexed as to why
the Burnses have cited us this case to support their proposi-
tion that the activity in question in the case at bar was the
maintenance of property. As the Court in *Dohm* ruled, it is
the nature of the activity on the occasion of the injury that
is controlling. *See also Haley v. City of Baltimore,* 211
Md. 269, 272, 127 A.2d 371 (1956). Unlike the rental of
space for a purely private event, on the night Marcia Burns
was injured the theater was being used by a city authorized
and funded ballet for the purpose of entertaining the public
at large.

The Burnses seem to ignore the public benefit of having a
local ballet production. This recreational program is no less
beneficial than the maintenance of a park or a sports
facility. Music and dance uplift the spirit of the citizenry
and provide an escape from the drudgery of day-to-day
existence. In short, the presentation of a ballet can be
interesting, educational and inspiring. As the Court of
Appeals noted in *Austin,* 286 Md. at 66, 405 A.2d 255,
quoting this Court:

> " '[t]o deny the City the protection of its cloak of govern-
> mental immunity in the operation of an activity necessary
> to health, education and welfare ... must have a chilling

effect on the ability and willingness of the City to continue to furnish that vitally needed service in the future.' "

■ Since the ballet program was legislatively authorized, for the public benefit with little or no dollar profit or emolument to the municipality, benefited the public health, education and welfare and had no element of private interest, we hold the court was correct in concluding the nature of the activity in question in the case *sub judice* was governmental rather than proprietary.

## III. WAIVER OF DEFENSE OF IMMUNITY

The Burnses also suggest that the award of summary judgment on the basis of immunity was improper because Rockville waived the defense. They assert that because Rockville's articles of incorporation and the city charter provide that the corporate body may "sue and be sued," the right to the cloak of immunity was forfeited.

As we quoted from *Kranz*, 308 Md. at 622, 521 A.2d 729, state agencies are generally immune from suit unless immunity has been waived. In *Bradshaw v. Prince George's County*, 284 Md. 294, 396 A.2d 255 (1979), the Court of Appeals upheld a provision in a county charter waiving the county's immunity as a proper exercise of the county's authority to enact "such ordinances as may be deemed expedient in maintaining the peace, good government, health and welfare of the county." [3] The Burnses propose that because the Legislature empowered other municipalities with the same general welfare power, Rockville, by analogy, has the authority to waive its tort immunity. As they explain, since Rockville's articles of incorporation provide that "[t]he inhabitants of the City of Rockville, Montgomery County, are a body corporate by the name of 'The Mayor and Council of Rockville', and by that name may have perpetual succession, sue and be sued and have and use a common seal," and included within those general

---

3. 1970 Md.Code Ann. Art. 25A, § 5(S).

powers is the power to establish and operate recreational programs, the provision "allowing the Mayor and City Council of Rockville to sue and be sued clearly contemplated the filing of suits against said body corporate incident to the operation of such public recreational facilities." To bolster this argument, the Burnses point out that the articles of incorporation and the charter provide a method for Rockville to satisfy a judgment against it through the borrowing of funds, appropriations and local taxes.[4]

The Court of Appeals in *Lohr v. Upper Potomac River Commission*, 180 Md. 584, 588–89, 26 A.2d 547 (1942), when determining whether the phrase "to sue and be sued" contained in the Act creating the Upper Potomac River Commission constituted a waiver of the Commission's immunity, instructed:

"In considering the question of whether the words 'to sue and be sued' ... was intended to constitute a waiver of immunity, we must not confine ourselves to those words alone, but we must construe them in connection with the other language of the Act."

The Court continued:

"The sentence in which those words are used is 'with the right to use a common seal, to sue and be sued, and to do any and all other corporate acts for the purpose of carrying out the provisions of this Act.' That sentence must be considered in its entirety, and when so considered, it definitely is not a general consent to suits of any and all kinds, but it is expressly limited to such actions as would be necessary in order to carry out the purpose for which the Commission was created."

*Lohr,* 180 Md. at 589, 26 A.2d 547; *see also O & B. v. Maryland-National Capital Park and Planning Commis-*

---

**4.** At the hearing on the motion for summary judgment, the Burnses procured the following stipulation: "The parties stipulate that [Rockville] has funds available to satisfy any judgment entered in this case and/or it has the requisite power to raise the funds necessary to satisfy any judgment entered in this case."

*sion,* 279 Md. 459, 466–68, 369 A.2d 553 (1977) (enabling statute for Maryland-National Capital Park and Planning Commission providing that "[t]he Commission may exercise all powers and functions granted to it in this article[,] [i]t may use a common seal, sue and be sued and do any and all other corporate acts for the purpose of carrying out the provisions of this article" did not constitute a waiver of immunity).

In contrast to the holdings in *Lohr* and *O & B,* the Court of Appeals found waivers of immunity in *Katz v. Washington Suburban Sanitary Commission,* 284 Md. 503, 397 A.2d 1027 (1979), *Bradshaw,* and *Kranz.* In *Katz,* after emphasizing that a legislative authorization for a state agency "to sue and be sued" does not by itself amount to a general waiver of immunity, the Court held that the provision in question accomplished a waiver because "§ 1–3 of the [WSSC] Code does not merely empower the WSSC 'to sue and be sued.' Rather, in unmistakable terms, it contemplates the filing of suits against the WSSC for matters within the scope of its responsibilities, and the recovery of judgments against it." *Katz,* 284 Md. at 513–14, 397 A.2d 1027.[5]

---

5. Section 1–3 provided:
   " 'The members of said commission shall be a body corporate by the name of the "Washington Suburban Sanitary Commission," with the right to use a common seal, to sue and be sued, and to do any and all other corporate acts for the purpose of carrying out the provisions of this chapter. In the event of a judgment at law or in equity being recovered against said commission or for the purpose of amicably adjusting threatened or pending litigation, the commission shall at the annual tax levying period of the county council of Montgomery County and the county commissioners of Prince George's County next succeeding the rendition of said judgment or compromise, certify to said county council of Montgomery County and county commissioners of Prince George's County, a tax rate, in addition to that required for its interest, serial bonds and sinking fund requirements, that will, when levied and collected under the provisions of ... [section 4–5 of this Code], produce an amount sufficient to satisfy said judgment or other sum including costs and counsel fees, if any, provided, however, that this provision shall relate only to any cause of action occurring subsequent to April 26, 1927....' " (Brackets in original.)

Similarly, in *Bradshaw*, 284 Md. at 301, 396 A.2d 255, the Court of Appeals upheld a waiver of tort immunity by Prince George's County ruling:

"The first sentence of § 1013 [6] is unambiguous in stating that the county may be sued in tort actions 'in the same manner and to the same extent that any private person may be sued.' We think this sentence expresses the county's determination to waive the immunity it would otherwise enjoy at common law for its acts performed in a governmental (as opposed to a proprietary) capacity. By providing that its amenability to suit shall be 'in the same manner and to the same extent' as that of 'any private person,' the county has accepted liability for those torts, but only those torts, for which 'any private person' would be responsible, either directly or derivatively. In other words, we think that the county intended to waive its own immunity, and to subject itself to liability under the same circumstances as if it were a 'private person.'"

Finally, in *Kranz*, the Court of Appeals ruled that Md. Code Ann. Art. 28, § 2–111 (1957, 1986 Rep.Vol.),[7] waived

---

*Katz*, 284 Md. at 505–06, 397 A.2d 1027.

**6.** Section 1013 of the Prince George's County Charter stated:
"'Governmental Liability. The County may be sued in actions sounding in tort in the same manner and to the same extent that any private person may be sued. The County shall carry liability insurance with adequate limits to compensate for injury to persons or damage to property resulting from negligence and other wrongdoings of its officers, agents, and employees. Nothing herein shall preclude the County from meeting the requirements of this section by a funded self-insurance program.'"
*Bradshaw*, 284 Md. at 295, 396 A.2d 255. *See Prince George's County v. Fitzhugh*, 308 Md. 384, 519 A.2d 1285 (1987), for a recent discussion of the amendment to § 1013 and its effect on immunity.

**7.** The provisions of Art. 28, § 2–111, which the Court construed, provided:
"(a) Establishment; purposes.—The Commission shall establish an adequate comprehensive insurance program:
(1) To compensate for injury to or death of persons or damage to property, resulting from negligence, malpractice or any other type of civil or tortious action of the Commission, or of its members,

immunity for both governmental and proprietary functions of the Maryland-National Capital Park and Planning Commission, but such waiver was limited. The Court held that for certain claims, particularly claims based on malicious acts, gross negligence, liability exposure in excess of insurance limits, punitive damages, or for any liability not covered by the Commission's insurance, the defense of immunity is still available to the Commission.

■ Turning to Rockville's articles of incorporation and charter, we hold the trial court was correct in concluding no waiver occurred. These documents that permit the body corporate to "sue and be sued" do not authorize general tort liability as was clear in *O & B*. Unlike in *Kranz*, the documents make no mention of civil or tort liability at all. Instead, Rockville's corporate papers do recognize an avenue for redress by those injured when Rockville is engaged in a proprietary function. They also provide the power for Rockville to seek redress if an injustice against it has occurred. Since a waiver of immunity must be legislatively authorized, *Katz*, 284 Md. at 513, 397 A.2d 1027, and since waiver from suit is not to be presumed, *Dunne v. State*, 162 Md. 274, 288–89, 159 A. 751, *appeal dismissed*, 287 U.S.

---

staff, employees, and agents acting within the scope of their duties, acting without malice, and in the absence of gross negligence; and

(2) To provide protection for property of the Commission and for officials and employees acting within the scope of their duties, including a comprehensive workers' compensation program. The Commission may purchase such other liability insurance as it deems necessary.

\*    \*    \*    \*    \*    \*

"(e) Governmental immunity.—The Commission may raise the defense of partial governmental immunity for any liability exposure in excess of insurance limits, when punitive damages are sought, or for any other liability exposure not covered by insurance. However, nothing in this section may be construed to be a waiver of the Commission's total governmental immunity. This subsection is intended to include also all claims pending on June 1, 1978, provided that an insurance policy to cover such liability was in effect at the time the claim accrued."

564, 53 S.Ct. 23, 77 L.Ed. 497 (1932), the Burnses' contention must fail.[8]

## IV. CONSTITUTIONALITY OF GOVERNMENTAL IMMUNITY

█ Finally, the Burnses urge this Court to abolish the doctrine of immunity as applied to municipal corporations because the distinction between governmental and proprietary functions denies equal protection and due process of law and is contrary to governmental responsibility. They assure us that since municipal immunity was established by judicial decision rather than by the General Assembly, this Court possesses the authority to accomplish their request. We do not accede to their request.

Repeatedly, when asked to abolish state or municipal immunity, the Court of Appeals has declined to do so. *See Austin*, 286 Md. at 51–61, 405 A.2d 255; *Bradshaw*, 284 Md. at 300, 396 A.2d 255; *Board of Trustees v. John K. Ruff, Inc.*, 278 Md. 580, 584, 366 A.2d 1360 (1976); *Jekofsky v. State Roads Comm'n*, 264 Md. 471, 474, 287 A.2d 40 (1972); *Quecedo v. Montgomery County*, 264 Md. 590, 595, 287 A.2d 257 (1972); *Robinson v. Board of County Comm'rs*, 262 Md. 342, 345, 278 A.2d 71 (1971); *State, ex rel Wilkerson v. Baltimore County*, 218 Md. 271, 273, 146 A.2d 28 (1958). Recently, in *Austin*, 286 Md. at 60, 405 A.2d 255, the Court stated:

"In practical effect, [Mrs. Austin asks to] abrogate[ ], to all intent and purpose, the doctrine of sovereign or governmental immunity, and, this, we have decided, should not be done by judicial decision. Although aware that the guidelines we have established are at times difficult to apply, we do not believe that they are 'irrational, unjust and unworkable.' They were developed over a period of years by decisions of this Court on a rational basis.

---

8. Since we hold that there was no waiver of immunity, whether funds were appropriated for the payment of tort judgments is irrelevant. *See O & B*, 279 Md. at 468, 369 A.2d 553.

They are consistent with sound public policy. They have worked effectively in their application to divers factual situations."

The Court also noted that in light of the fact that the Legislature has had numerous invitations to modify the doctrine, and has declined,

"[i]t is manifest that our position, long firmly established, that if there is to be further change in the doctrine the legislature should make it, encompasses not only the ancient common law concept but also the engrafting thereon by judicial opinion the aspect of municipal tort liability." (Footnote omitted.)

*Austin,* 286 Md. at 56, 405 A.2d 255. In light of the continued reluctance exhibited by the Court of Appeals to abrogate the doctrine of tort immunity, we will not rule unconstitutional this type of immunity from suit.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.