587 A.2d 1168

**John F. HIGGINS, et ux.**

v.

**CITY OF ROCKVILLE, et al.**

No. 853, Sept. Term, 1990.

Court of Special Appeals of Maryland.

April 3, 1991.

672

Michael F. Flynn, Jr. (Christopher C. Fogleman and Glea-son and Flynn, Chartered, on the brief), Rockville, for appellants, Higgins.

Alexander H. Gillespie and Jackson and Campbell, P.C., on the brief, Washington, D.C., for appellant, Group Hospitalization Medical Services, Inc.

John M. Quinn (Quinn & McAuliffe, on the brief), Rockville, for appellees.

Argued before MOYLAN, BLOOM and DAVIS, JJ.

MOYLAN, Judge.

The plaintiff-appellants, John F. Higgins (Higgins); Margaret M. Higgins, his wife; and Group Hospitalization Medical Services, Inc., appeal from the granting by the Circuit Court for Montgomery County of a judgment at the close of the plaintiffs' case in favor of the appellees, City of Rockville (City) and Gregory A. Bayor (Bayor). Upon this appeal, the appellants raise the following four contentions:

1. That the trial court erred in holding that the appellees enjoyed sovereign immunity because the maintenance and operation of the public walkway involved the exercise of a governmental function;

2. That the trial court erred in holding that the appellants had failed to adduce legally sufficient evidence of negligence;

3. That the trial court erred in holding that the appellant, John F. Higgins, was contributorially negligent as a matter of law; and

4. That the trial court erred in excluding appellants' evidence of subsequent remedial measures.

When a defendant moves for judgment at the close of the plaintiff's evidence, the court must consider all evidence and inferences in the light most favorable to the plaintiff. Md. Rule 2–519(b); *Pahanish v. Western Trails, Inc.*, 69 Md. App. 342, 353, 517 A.2d 1122 (1986). The facts in the case, viewed in that light, are as follows.

The former Broome Junior High School in Rockville and its surrounding campus are owned by Montgomery County (County). In October, 1986, the former school housed the Alcoholic Treatment Center and an Autistic Education program. From January, 1984, until the time of the accident, the County leased the school's athletic field to Rockville. In effect, the former campus was split into two roughly equal parcels. That part which had been the school's athletic fields, located essentially behind the school building, was leased to the City of Rockville to use for municipal recreational purposes. Its management was assigned by the City to its Department of Recreation and Parks. It was designated as the Broome Athletic Park. The remainder of the former campus, fronting on Twinbrook Parkway and containing the school building proper, some tennis courts, parking lots and driveways and surrounding lawn, remained in the possession of Montgomery County. As one of the conditions of the lease, the City agreed to maintain that part of the original campus which remained in the possession of the County, including the parking lots and driveways.

Specifically, the City and the County agreed that the City would be responsible for maintaining the driveway, which led from the parking lot off Twinbrook Parkway and circled around behind the school, in front of the athletic field, and returned to Twinbrook Parkway. The driveway was used

by "voters dropping off their ballots," [1] waste trucks picking up trash dumpsters, and other maintenance vehicles. It was also regularly utilized by pedestrians for various purposes, but primarily for access to the athletic fields. Although the County refused permission, the City nonetheless installed bollards and chains on the driveway at the two rear corners of the building in March, 1985, through the Department of Recreation and Parks (Department). At that time, Gregory Bayor was the director of the Department.

On Friday, October 10, 1986, Higgins took his four sons, ranging from 10 to 3 years of age, to his wife Margaret's softball game at the Broome Athletic Park. He arrived at approximately 7:55 p.m., when it was dark, parking the car in the unlit parking lot on the school campus just off Twinbrook Parkway. He and the boys proceeded from the parking lot down an unlit driveway, apparently the primary route to the athletic field. Three of the boys, including the three-year old, moved ahead of him. Fearing that the youngest would fall down the stairs leading to the field, Higgins increased his pace to a trot or a run down the driveway. Although occasionally glancing to his side or behind him (at one of the boys), he "was primarily looking straight ahead." As he ran, Higgins felt something come into contact with his leg, just below his knee, tripping him and causing him to break his elbow. The object causing the fall was a chain or cable (cable gate), approximately 10 feet in length, strung between two posts, or bollards, with white tubing covering the middle section. Higgins saw no warning signs; nor did he see the cable gate.

Only a matter of minutes before, Michelle Buterbaugh had also tripped over the cable gate, but sustained no injuries. She had been walking at a normal pace, looking straight ahead, and still failed to see the cable gate.

---

1. The parties agreed that voters dropped off their ballots but the record does not reveal what precise election function the former school was serving on these occasions.

Higgins sued the City and the County, alleging negligence in failing to provide a safe walkway, in failing to warn of a dangerous condition and in failing to correct a known, dangerous condition. Higgins' injuries caused him to undergo three operations and prevented him from working for six months, thereby losing one-third of his base pay and his usual overtime. The damages asked for included lost wages, lost earning capacity, past and future medical expenses, and pain and suffering. He and his wife also sued for loss of consortium. The complaint was amended to include Bayor[2] as a defendant. Group Hospitalization Medical Services, Inc. known as Blue Cross and Blue Shield of the National Capital Area, intervened, claiming subrogation for the medical expenses incurred by Higgins.

On May 14, 1990, the case proceeded to trial before a jury. The court refused to permit evidence that the City had subsequently installed a light above the cable gate and had covered the cable with fluorescent orange tubing. At the close of the plaintiffs' case, the defendants moved for judgment, arguing that a *prima facie* case of negligence had not been established, that Higgins was contributorially negligent as a matter of law, and that they enjoyed governmental immunity. The motion was granted on all three grounds.

The appellants appeal the lower court's decision only as to the City of Rockville and Bayor.

### Governmental Immunity

A. As to the City of Rockville:

The appellants contend that the City and Bayor are not immune from liability. They argue that the trial court misapplied the sovereign or governmental immunity doc-

---

**2.** Marla Schoolmeister, Sport's Supervisor for Women's Sports; David Mansell, Field Supervisor; Dennis Creehan, Parks Superintendent; Bert Hall, Director of Recreation; and Charles Miller, Sports Supervisor, were also named as defendants in the amended complaint. They were later dismissed from the case.

trine in finding that the City was acting in its governmental capacity.

The difference between the broad sovereign immunity enjoyed by the State of Maryland and the more limited governmental immunity enjoyed by a county or municipal corporation within the state was well spelled out by Judge Eldridge, in *Maryland–Nat. Capital Park and Planning Com'n v. Kranz,* 308 Md. 618, 622, 521 A.2d 729 (1987):

> "As this Court has often pointed out, the doctrine that the State of Maryland and state agencies are generally immune from suits, unless the immunity has been waived by the General Assembly, 'is firmly embedded in the law of Maryland.' On the other hand, counties and municipalities do not possess this general immunity. Instead, counties and municipalities have never been given immunity in contract actions, and, in tort actions, they are not immune with regard to those matters categorized as 'proprietary' but are immune with regard to those matters categorized as 'governmental.'" (citations omitted).

*See also Mayor and City Council of Baltimore v. State, ex rel. Blueford,* 173 Md. 267, 271, 195 A. 571 (1937); *Burns v. City of Rockville,* 71 Md.App. 293, 297–298, 525 A.2d 255 (1987).

■ Where a municipal corporation is performing a governmental function, it enjoys the same immunity as the state itself. *Mayor and City Council of Baltimore v. State, ex rel. Blueford, supra,* fully explained this concept, at 173 Md. 271–272, 195 A. 571:

> "That immunity extends to such agencies of the state as have no separate corporate existence but are employed by it merely as hands or instruments to execute its will, but not to its creatures, such as municipal corporations, except when exercising some governmental function of the state itself. Where, however, a municipality is engaged in the performance of a governmental function as an agent of the state, the same principle which protects the state from liability also protects the municipality. So that, where that principle of immunity is invoked in

behalf of a municipality charged with a tort, the primary and essential inquiry is whether the tortious act was done in the course of the performance of some governmental duty or function." (citations omitted).

*Blueford* provided the guidelines for determining when the actions of a municipality are governmental in nature, at 173 Md. 276, 195 A. 571:

"Where the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to bene-fit the public health and promote the welfare of the whole public, and has in it no element of private interest, it is governmental in its nature."

The *Blueford* case also established unequivocally that the maintenance of a public park by a municipality is a govern-mental function enjoying sovereign immunity:

"[T]he maintenance of a public park is a governmental function, and ... the municipality is not liable for any default or neglect of its agents or employees in the management thereof."

173 Md. at 272, 195 A. 571. *See also City of Baltimore v. State, Use of Ahrens,* 168 Md. 619, 626, 179 A. 169 (1935). *And see Haley v. City of Baltimore,* 211 Md. 269, 272–273, 127 A.2d 371 (1956):

"The law of this State is well established that a munici-pal corporation is not liable in a civil action for any default or neglect in the performance of a purely govern-mental function, such as the maintenance and manage-ment of a public park for recreational purposes."

■ Overlapping and closely related to the immunity enjoyed by a municipality in its governmental function of maintaining a public park for recreational purposes is sim-ilar immunity in its governmental function of conducting municipal recreation programs. *Austin v. City of Balti-more,* 286 Md. 51, 63, 405 A.2d 255 (1979); *Burns v. City of Rockville,* 71 Md.App. 293, 303–308, 525 A.2d 255 (1987).

Indeed, the appellants acknowledge that the City would have enjoyed governmental immunity had the incident occurred within the confines of Broome Athletic Park and had the injury been suffered by a player, spectator, or other participant involved in the recreational activities of the park. They strenuously maintain, however, that when the agents of the City stretched the cable gate across the width of the driveway leading to the park, the City was engaged in the very different proprietary function of maintaining streets and walkways and was thus bereft of any governmental immunity for its negligence in the performance of that function.

■ The distinction between a municipality's governmental functions and its proprietary functions is, in.terms of both policy and logic, a sound one. What is bizarre is the placement of the maintenance of streets, highways, and walkways in the proprietary column rather than in the governmental column. Bizarre or not, it is nonetheless the indisputable and long-settled law of this state.

It has long been held that a municipality is not immune from a negligence action arising out of its maintenance of its public streets and highways. One of the first cases in which a municipality was held liable on this basis was *Mayor and City Council of Baltimore v. Marriott*, 9 Md. 160, 176 (1856), in which the plaintiff recovered from the City due to the City's negligent failure to clear an accumulation of ice from a sidewalk, on which the plaintiff fell and was injured. Later, in *Mayor and City Council of Baltimore v. Walker*, 98 Md. 637, 644, 57 A. 4 (1904), the Court of Appeals again held the City liable for injuries caused by its neglect in maintaining a public street. The Court subsequently stated that it is the duty of a municipality to keep its streets in a safe condition for public travel and that if it negligently fails to do so, and travelers are injured without their own negligence, the municipality is liable. *State, Use of Biggs v. Baltimore City*, 129 Md. 686, 99 A. 860 (1917).

*Baltimore v. Eagers*, 167 Md. 128, 136, 173 A. 56 (1934), treated the principle as one of long standing:

> "There is no question that, by the great weight of authority, the rule of law is that it is a private proprietary obligation of municipal corporations to keep their streets and public ways reasonably safe for travel in the ordinary manner, and to prevent and remove a nuisance affecting the use and safety of these public ways."

*Haley v. City of Baltimore, supra*, spoke to the same effect, at 211 Md. 273, 127 A.2d 371:

> "On the other hand, the keeping of public highways and walkways under its management and control in a reasonably safe condition is a corporate function of a municipality and it is therefore answerable in damages for failing to exercise such function."

*And see Wynkoop v. City of Hagerstown*, 159 Md. 194, 198, 150 A. 447 (1930); *Mayor and City Council of Baltimore v. Thompson*, 171 Md. 460, 467, 189 A. 822 (1936); *County Commissioners of Harford County v. Love*, 173 Md. 429, 432, 196 A. 122 (1937).

The apparently illogical nature of this placement has been commented upon by *Baltimore v. State, Use of Blueford, supra*, at 173 Md. 272, 195 A. 571:

> "It is undoubtedly true that it is difficult to discover any logical distinction between the governmental character of such a duty as that of maintaining the public highways, which in this state has been held to be a private corporate function ..., and that of maintaining the public parks, which was held in *Baltimore v. State, use of Ahrens, supra*, to be a public, political, and governmental function." (citation omitted).

Our case law has nonetheless regularly held that a municipality has a "private proprietary obligation" to maintain its streets, as well as the sidewalks, footways and the areas contiguous to them, in a reasonably safe condition. *Pierce v. City of Baltimore*, 220 Md. 286, 290, 151 A.2d 915 (1959) (streets, sidewalks, footways and contiguous areas); *Birck-*

*head v. Mayor and City Council of Baltimore,* 174 Md. 32, 36–37, 197 A. 615 (1938) (highway and areas adjacent to it); *Mayor and Council of Hagerstown v. Hertzler,* 167 Md. 518, 520–21, 175 A. 447 (1934) (strip between road and sidewalk).

The exemption of this particular function from the benefits of governmental immunity, logical or illogical,[3] seems destined to remain with us for the foreseeable future. As the *Blueford* case noted, at 173 Md. 273, 195 A. 571:

> "[T]he two principles, one that a municipal corporation is not liable in a civil action for any default or neglect in the performance of a purely governmental function, and the exception that it is liable for failure to keep the public highways under its management and control in a reasonably safe condition, are too firmly embedded in our law to be disturbed now."

The neat distinction between a governmental function and a proprietary function—between immunity and liability—loses its clarity, however, when applied to a hybrid function. What happens when a public roadway or public walkway (proprietary) goes through or simply into a park or other recreational area (governmental)? Is a centaur more like a man or more like a horse? The Court of Appeals has grappled with the classifying of the hybrid in both *Baltimore v. Eagers,* 167 Md. 128, 173 A. 56 (1934), and *Haley v. City of Baltimore,* 211 Md. 269, 127 A.2d 371 (1956).

■ In sorting out immaterial factors from pivotal factors, the *Eagers* case held that the job classification of the allegedly negligent actor is not controlling. If negli-

---

**3.** Gilbert, Gilbert & Gilbert, *Maryland Tort Law Handbook,* § 2.10, p. 14 (1986) notes:

> "An anomaly in the law is that directing traffic movement over the public streets is a governmental function, while maintaining those selfsame streets is a proprietary function. There appears in the case of the latter to be no reason for the distinction. The street or highway maintenance exception has become an integral fact of Maryland law and, in the absence of legislation to the contrary, is unlikely to disappear."

gence occurs on a roadway in a park, liability will not turn upon whether the negligent agent was an employee of the Highway Department or of the Department of Parks and Recreation. As *Eagers* held, 167 Md. at 137, 173 A. 56:

> "[W]hether the city is liable in a civil action for neglect on its part or on the part of its servants is determined by the nature of the act, not by the identity of the servant of the municipality who was guilty of the negligent act."

Thus, the fact that the Rockville official who ordered the installation of the bollards and the cable gate was the Director of the Department of Recreation and Parks, the appellant Bayor, is of no moment in determining the immunity or liability of the City of Rockville.

Turning to the issue of use, both *Eagers* and *Haley* held that the proper maintenance of the public walkways in those cases, albeit the walkways were within the geographic confines of parks, was part of the proprietary responsibility of the municipality to maintain highways, streets, and public walkways in a safe condition. In *Eagers*, the Court of Appeals held that the City was not immune from liability arising out of the negligent removal of a tree which resulted in the death of a pedestrian walking along a public footway within a public square that was under the supervision and jurisdiction of the Board of Park Commissioners. The removal of the dead or diseased tree for purposes of park beautification and preservation was clearly part of the governmental function of maintaining parks. The negligence of the park employees in removing the tree in such a way that a dead branch fell on a pedestrian on a walkway twenty feet from the base of the tree engaged the gears, however, of the proprietary function of maintaining streets and footways.

In the *Eagers* case, the park property in question was Collington Square, which was precisely one square block in area. The footways in question paralleled the four surrounding streets that formed the perimeter of the square. The footways were, therefore, continuations of intersecting sidewalks from beyond the boundaries of the square. The

opinion in *Eagers*, however, attached no significance to (indeed, never alluded to) the possibility that the fatally injured pedestrian may have been in transit through the square rather than walking into the square simply to enjoy its amenities.

That arguable distinction and the resulting ambiguity on which the appellee City of Rockville and the trial judge relied arose in the *Haley* case. In *Haley*, the City of Baltimore was held not to be immune from suit for injuries arising out of its negligent maintenance of a concrete walkway, including its column of steps, that crossed a public park. The park was Preston Gardens, a long and thin strip of land separating St. Paul Street from St. Paul Place. Although Chief Judge Brune's opinion in *Haley* never stated that the maintenance of walkways within the park that were used primarily for the internal enjoyment of the park would be part of the City's governmental function and thus entitled to sovereign immunity, the opinion's choice of words repeatedly raised the strong implication that the maintenance of the walkway in question was a proprietary function simply because the walkway facilitated pedestrian traffic *through* or *across* the park. The opinion stressed that the "steps were a part of a concrete walk connecting two intersections" and that the "walk ... furnishes the most direct access between the aforesaid intersections of public highways." 211 Md. at 271, 127 A.2d 371. It spoke of "the maintenance of these concrete steps *leading through* Preston Gardens." *Id.* at 272, 127 A.2d 371. It took pains to point out:

"The walkway and steps where the accidents in question took place are so located as to constitute a straight and direct connecting link between the sidewalks on Franklin Street east and west of St. Paul Place and St. Paul Street."

*Id.* The holding in *Haley*, at 211 Md. 273, 127 A.2d 371, was:

"In the case at bar *the appellants were using the steps* as part of the public highway in order to travel between

points which were outside the park and *not for recreational purposes.* It is stipulated that numerous persons use these steps and walkways to travel from St. Paul Street to St. Paul Place and *vice versa.* In such circumstances, we think that the steps constitute a public highway of the City, that it is immaterial which department of the City is charged with their maintenance." (emphasis supplied).

The implication is too strong to ignore. It is, however, difficult to appreciate fully the limits of its logic. Does it suggest that the maintenance of those very steps would have been transformed from something proprietary in nature to something governmental in nature if an alternative and more direct pedestrian route had been available that did not pass through the park? In laying out roadways and walkways through parks, are straight lines more proprietary and meanders more governmental? In classifying the function of maintaining public passageways, does concern with efficiency make it more proprietary and concern with leisurely enjoyment make it more governmental? Is the maintenance of a walkway (or a roadway) that enters a park, meanders around it, and then leaves the park again by the original entrance necessarily a governmental function because the loop is not a conduit from A to B? With respect to such an inner loop, is the nature of the City's maintenance responsibility the same with respect to a footway for strollers, a track for cyclists, and a roadway for Sunday afternoon motorists? Within a park, is a footway (or roadway) that connects one recreational attraction (the zoo) with another recreational attraction (the boat lake) a passageway that is serving a travel use or a recreational use?

It would seem that when the city creates (or fails to correct) a hazard, it is *ab initio* either immune from the consequences of its negligence or it is not. The passage from *Haley,* however, would suggest that immunity might be contingent upon the particular business of the particular pedestrian who happens to run afoul of the hazard. Does

one pedestrian, stepping into an unanticipated pothole, create liability in the city because he is busily bound from West Franklin Street to East Franklin Street oblivious to the intervening charms of the Preston Gardens, whereas another pedestrian, stepping into the same pothole, is thwarted by sovereign immunity simply because she ambled into the Gardens to smell the flowers (thereby using the place "for recreational purposes")? Can the nature of the city's responsibility turn upon the mere chance occurrence of who is injured by its failure to fulfill its responsibility? In terms more immediately pertinent to the present case, if the City of Rockville were negligent in its installation of the bollards and cable gate, would it be liable to suit by a pedestrian who tripped over the cable gate while delivering ballots to the rear door of the school building but immune from suit by another pedestrian who simultaneously tripped over the same cable gate while bound for the softball field? *Haley* cannot mean what it seemed to say.

Nonetheless, the appellees and the trial judge were caught up in what *Haley* seemed to say. The City of Rockville was ruled to have been performing a governmental function, thereby enjoying governmental immunity, when it raised the cable gate across the driveway for the reason that Higgins, and most of the other pedestrians using that same driveway at that time of day, were bound for the athletic field to observe a recreational activity in progress. The ruling of the trial court was:

"I frankly, on this record, am inclined to agree that this is a governmental function. Having reconsidered the configuration of that school, it is clear to me that—I thought at first there was a separate exit behind the school, but I see now that there was not. One would simply go from Twin Brook Parkway right back onto Twin Brook Parkway by going around the back of this building.

In no sense, and I think this is a fair reading of Haley, could one say that this is used as a transfer point, as a shortcut for the public to go from one public place to another. One simply goes back there to service the area,

or to park and use it as a recreational facility under these circumstances.

In my view, this would be a park function, that, under the rule of Haley, would be government immunity."

■ Fortunately, we do not have to confront the implications of *Haley* head-on for, even assuming they have validity, they are geographically inapposite. The appellees and the trial judge have extrapolated too facilely from the inferential significance of a recreational use of a public way within a park to an hypothesized similar significance when the public way is not within a park (albeit close to and approaching the park). In the first setting, the park is a place wherein governmental immunity presumptively exists. The maintenance of a public way *through* the park, however, involves an exemption from that immunity. A showing that the public way is used for a recreational purpose rather than for through-transit is, in turn, an effort to ward off that exemption and preserve the original immunity. This very specialized doctrinal thrust-and-parry cannot be transferred from one context (park land) to a very different context (the world outside the park).

The responsibility of the City of Rockville, through its arrangement with Montgomery County, for the maintenance of the parking lot and driveways on the campus of the former Broome Junior High School is precisely what it would have been, had the Broome Athletic Park never existed. John Hayes, a witness representing the City at trial, characterized the driveway as a "service access" road. Evidence at trial showed that waste trucks, maintenance vehicles and voters dropping off their ballots regularly use the driveway. The driveway was a place the City was proprietorially obligated to maintain "in a reasonably safe condition." *Pierce v. Baltimore*, 220 Md. at 290, 151 A.2d 915; *Baltimore v. Eagers*, 167 Md. at 136, 173 A. 56. Under the agreement with the County, the City specifically agreed to maintain the driveway, thereby including it as part of the streets, sidewalks, and footways it already had a duty to maintain.

Clearly, the City would have been liable to suit if its negligent maintenance of the driveway had led to the injury of the truck drivers who used it to pick up trash and garbage from the rear of the school, of the operators of the maintenance vehicles who used it regularly to service the area or of the voters who used it to drop off their ballots at the school. To the extent to which it was used as a pedestrian walkway as well as a vehicular driveway, the City would have been liable for any negligent maintenance that caused injury to those pedestrians. Once it is established that it was part of the proprietary responsibility of the City to maintain the driveway in a safe condition, the liability of the City was not contingent upon whether the injured pedestrians and/or motorists were bound for the rear of the school or were bound for the playing fields.

The fact that the spot where Higgins tripped over the cable gate was close to the athletic field and the fact that he, and other pedestrians that evening, were headed toward the athletic field, do not erode in any way the City's proprietary duty to maintain the driveway. Had a pedestrian been injured, through the City's negligence, on Twinbrook Parkway or one of the other surrounding streets, the fact that the pedestrian was headed for the athletic field and closely approaching the athletic field would not confer upon the City an immunity that otherwise did not exist. In terms of the City's proprietary responsibility, the driveway was the equivalent of a surrounding street.

Since the City's responsibility for the maintenance of the driveway was proprietary in nature, it was not immune from suit for any negligence that may have occurred.

B. As to the Appellee Bayor:

The appellee Bayor also raised the defense of immunity in his special capacity as Director of the Department of Recreation and Parks. Md.Code Ann. art. 23A § 1B(a) (1957, 1981 Repl.Vol.). Because the trial judge granted a directed verdict in favor of the appellees on the broad ground that the City of Rockville was acting in a governmental capacity

and thereby enjoyed general immunity, as well as the additional grounds that there was no primary negligence in the erection of the cable gate and that Higgins was guilty of contributory negligence in falling over the cable gate, there was no need for him to render a decision on this additional claim of immunity raised by the appellee Bayor. Upon retrial, Bayor is free to raise the defense again and both sides will have the opportunity to litigate fully the merits of such defense.

## Primary Negligence

The appellants maintain that the trial court erred in ruling that they had failed to establish a prima facie case of negligence. They argue that, viewing the evidence in the light most favorable to them, they presented sufficient evidence of a breach of duty to go to the jury. The applicable standards, set forth in *Mass Transmit Admin. v. Miller*, 271 Md. 256, 315 A.2d 772 (1974), provide:

"... that ordinarily [negligence] is a question of fact to be determined by the jury; that before it can be determined as a matter of law that one has not been guilty of negligence, the truth of all the credible evidence tending to sustain the claim of negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tending to establish negligence drawn; that 'Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury'; that the rule requires submission of the case to the jury if there be any evidence, however slight, legally sufficient as tending to prove negligence, the weight and value of such evidence being left to the jury."

271 Md. at 259, 315 A.2d 772 (quoting *Curley v. General Valet Service*, 270 Md. 248, 264, 311 A.2d 231 (1973)).

The appellants presented evidence that the cable was placed across a pedestrian walkway at a height of approximately fifteen (15) inches, at night, in a poorly lit or dark area, without a sign or any other warning advising pedestri-

ans of the cable's existence, and that another person had also tripped over the cable, while walking in a normal manner looking straight ahead.

■ We hold that the trial judge erred in ruling that there was no primary negligence as a matter of law. The City and Bayor, its employee, had a duty to maintain the walkway in a reasonably safe condition. *Pierce v. Baltimore, supra,* 220 Md. at 290, 151 A.2d 915; *Baltimore v. Eagers, supra,* 167 Md. at 136, 173 A. 56.

We find particularly instructive the case of *Mayor and City Council of Hagerstown v. Hertzler,* 167 Md. 518, 175 A. 447 (1934). That case dealt with the obligation of the City of Hagerstown to exercise care for the safety of pedestrians not only on a city boulevard and not only on the four-foot-wide concrete sidewalk that paralleled that boulevard but also on the intervening grass strip, three-and-a-half feet in width, that separated the sidewalk from the boulevard. In that case, a pedestrian, at night, tripped over a guy wire attached to a newly planted tree in the grass strip. Unlike the situation in the present case, it was the accepted inference in *Hertzler* that the City of Hagerstown had not planted the tree or erected the guy wires. That case dealt with the obligation of the City of Hagerstown to be aware of the hazard to pedestrians, even if it had not created it, and to take appropriate measures to ensure the safety of the pedestrians. Even though the duty of care with respect to grass strips is less than that with respect to the paved walkways themselves, Chief Judge Bond observed, at 167 Md. 520–521, 175 A. 447:

"The strips are parts of the highway, although the rights and duties with respect to them are not the same as those with respect to the paved ways, laid out for traveling. Foot passengers are not excluded from them, unless, indeed, by some effectual withdrawal of the strips from use, either by fences or notices. When the strips are left open to them, the pedestrians are, as stated, bound to protect themselves against any of the regular uses and obstructions, and comparative roughness of the

ground; protection may be required of the municipality only beyond that point. It is obliged to exercise care for the safety of the pedestrians against dangers, not from the customary, permissible uses or conditions, but dangers of a kind that would not be expected by foot passengers, dangers in the nature of traps. If the municipality should know of such dangers, or in the exercise of due care ought to know of them, it would be answerable to foot passengers who, though exercising due care on their own part, do not perceive the dangers."

In response to the argument that "guy wires are normal incidents of newly planted trees, to be avoided by pedestrians" rather than extraordinary hazards that should be noticed by the City, the Court of Appeals pointed out that issues such as this are appropriately left to the fact-finding prerogative of the jury:

"[I]n the opinion of this court, the question of whether guy wires are such normal incidents is a question which is not so clearly beyond controversy as to be answered by the court; it should be referred to the jury."

167 Md. at 521, 175 A. 447. In the case now before us, it was the City of Rockville itself that created the pedestrian hazard. *A fortiori,* the issue of primary negligence was one for the jury here.

Part of the appellants' claim of negligence against the City was based on the fact that after the cable gate was erected, the City then failed to give pedestrians adequate warning, particularly at night, of the hazard in their path—by way of a warning sign, by way of making the obstacle more visible, or by way of adequate lighting. The situation is not unlike that in *Baltimore v. O'Donnell,* 53 Md. 110 (1880). Agents of the city there strung a rope across West Street, which was under repair. Although a warning lantern was initially hung from the rope, the lantern was thereafter broken and temporarily removed. The plaintiff, at night, failed to see the rope and ran into it, thereby injuring himself. The city was held to be liable for failing to maintain an adequate warning light.

Viewing the evidence in the light most favorable to appellants, the trial judge could not say that the appellees were free of negligence as a matter of law. The evidence presented by the appellants was sufficient to require submission of the case to the jury.

### Contributory Negligence

■ The appellants also necessarily contend that the trial court erred in finding Higgins contributorily negligent as a matter of law. The appellees do not dispute that Higgins did not see the cable gate before falling over it or that he had no reason to know that it was there. Their position is that Higgins was not paying attention to where he was running and that since it was dark, he should be held to a higher degree of care under *Murphy v. Board of County Commissioners*, 13 Md.App. 497, 508–09, 284 A.2d 261 (1971). While admitting that he occasionally looked to his side and behind him at one of his sons, Higgins testified that he was "primarily looking straight ahead" when trotting on the walkway. Michelle Buterbaugh, moreover, testified that only a few minutes prior to the Higgins accident, she fell over the cable gate when walking normally and looking straight ahead.

Where the act "is of such a nature that reasonable minds, after considering all the circumstances surrounding the accident, may draw different conclusions as to whether it constituted contributory negligence," *Schroyer v. McNeal*, 84 Md.App. 649, 658, 581 A.2d 472 (1990) (quoting *Schwier v. Gray*, 277 Md. 631, 635, 357 A.2d 100 (1976)), it becomes a question for the jury.

Higgins may have been guilty of contributory negligence but not so clearly and decisively so as to take the issue away from the jury.

### Subsequent Remedial Measures

The appellants' last contention is that the trial court erred in excluding evidence of the City's subsequent remedial measures. Because we are reversing the judgment on the

grounds already discussed, this contention is moot. We need not speculate as to what evidence may be offered and what evidentiary rulings may be made in the course of a new trial.

JUDGMENT REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY; COSTS TO BE PAID BY APPELLEES.