883 A.2d 228

**Suzanne WHALEN**

v.

**MAYOR & CITY COUNCIL OF BALTIMORE.**

**No. 862, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Sept. 16, 2005.

294

Simon Walton, Baltimore, for appellant.

Justin J. King (Ralph S. Tyler, City Solicitor, on brief), for appellee.

Panel MURPHY, C.J., HOLLANDER and JAMES R. EYLER, JJ.

HOLLANDER, J.

This appeal gives new meaning to the phrase, "an accident waiting to happen." Suzanne Whalen, appellant, who is blind,

was injured when she fell into an uncovered utility hole while walking her guide dog within the boundaries of Leone Riverside Park (the "Park"), located directly across from the office of the National Federation of the Blind in Baltimore City. Appellant subsequently filed suit against the Mayor and City Council of Baltimore (the "City"), appellee. She claimed that the City, which owns and maintains the Park, was negligent in failing to assure that the hole was properly covered. Asserting defenses of governmental immunity, statutory immunity under a recreational land use statute, and lack of actual or constructive notice of the danger, the City moved for summary judgment. By Order dated June 9, 2004, the Circuit Court for Baltimore City granted the motion.

On appeal, Whalen poses one question that contains two distinct issues:

Whether summary judgment was inappropriate, based either upon common law sovereign [or governmental] immunity or the municipality's lack of actual or constructive notice of the defect.

To answer Whalen's inquiry as to governmental immunity, we must examine the dichotomy between governmental and proprietary functions of a municipality, and determine whether a public park may serve a dual purpose. Put another way, we must resolve whether the court below erred in deciding, as a matter of law, that because the accident occurred within the Park, the City is automatically protected by governmental immunity.

## FACTUAL SUMMARY

Appellant, a resident of Texas, visited Baltimore City in February 2000, to attend a meeting at the National Federation of the Blind ("NFB"), whose office is located at 1800 Johnson Street, directly across from the Park. According to appellant, "the folks" at the NFB advised the attendees "to go to this park across the street" when their service dogs needed to relieve themselves. In her complaint, filed on February 11, 2003, appellant alleged that she left the NFB meeting at

approximately noon on February 12, 2000, and "crossed the street with her dog to allow the dog to relieve itself." At that time, she "fell into an uncovered, cement-lined pit, approximately 19″ × 19″ and 41″ deep."

According to appellant, the "hole" was "located exterior" to a chain link fence that surrounded a play area "within the Park." Appellant also averred that the hole was situated in a grassy area "adjacent to the sidewalk and pedestrian crossing that crosses Johnson Street at its intersection with Barney Street." Moreover, she averred that because "this area was mowed, it was an area that was frequented by City employees."

Whalen claimed that the City "failed to use reasonable care, in that their agents and/or employees failed to ensure that the abandoned pit or hole immediately adjacent to a public sidewalk, in a grassy area where the public and their pets could be expected to walk, was securely covered or filled in." As a result of the fall, appellant allegedly "sustained serious injuries to her back and right ankle, which necessitates the use of a wheelchair." "These impairments," asserted Whalen, "are especially disabling, because she is blind." She explained: "This new disability prevents her from teaching, which was her occupation prior to the injury."

Appellee moved for summary judgment on April 13, 2004, claiming that there was "no evidence legally sufficient to permit the plaintiff to recover against the City." The City submitted numerous exhibits to support its motion. These included "Plaintiff's Answers to Interrogatories"; appellant's deposition, taken on February 17, 2004; appellee's "Answers to Interrogatories," prepared by an Assistant City Solicitor; the deposition transcript of John Rekus, appellant's expert, taken on March 3, 2004; ten photographs, collectively titled "Suzanne Whalen—Pictures of Scene"; an undated Affidavit of Phillip Buddemeyer, Supervisor in the Baltimore City Office of Transportation, Field Survey Section, who prepared a survey; a plat prepared by J. Allen Jones of the Survey Control Section, "SHOWING THE LOCATION OF A CON-

CRETE BASE WITH A 1.6 FOOT BY 1.6 FOOT OPENING ON THE WEST SIDE OF RIVERSIDE PARK ACROSS FROM 1746 JOHNSON STREET"; and an Affidavit of March 30, 2004, signed by J. Allen Jones, a licensed property line surveyor and Supervisor of the Survey Computations Unit in the City's Office of Transportation. We shall refer to these exhibits in our discussion of the City's contentions.

In its motion, the City maintained that there was "no evidence that [it] had actual or constructive notice of the existence of the hole." The City also pointed out that appellant did not establish "how long the hole had been present prior to the plaintiff's fall and it is not known how the hole came to exist." Appellee also cited to its Answers to Interrogatories, in which it averred that it did not know when the alleged hole "became unguarded and uncovered."

In addition, the City asserted that it was "immune from suit for actions claiming negligence in the maintenance of public parks." Appellee explained that "the maintenance and operation of a park is a governmental function," and local governments enjoy immunity with respect to "alleged tortious conduct arising out of governmental, rather than proprietary, functions."

Further, the City relied on § 5–1103 of the Natural Resources Article ("N.R.") of the Maryland Code (2000 Repl. Vol.), to argue that it did not owe a duty of care to appellant. According to the City, the statute "provides that the owner of a park does not owe a duty of care to keep the premises safe for entry or use by others for any recreational or educational purpose, or to give any warning of a dangerous condition ... on the premises to any person who enters on land for these purposes." Noting that "recreational purpose" is defined at N.R. § 5–1101(f) as "'any recreational pursuit,'" appellee argued that Whalen's use of the Park to allow her dog to relieve itself was "clearly a recreational purpose."

In her deposition testimony, appellant testified that she "stepped into the hole" when her dog pulled her while on his leash. In her Answers to Interrogatories, appellant explained:

Plaintiff extended the leash to permit the dog to relieve itself and stepped off of the sidewalk onto the grassy area immediately adjacent to the sidewalk so as to permit the dog to scamper more freely in the grass and also to ensure that she was not impeding the passage of other pedestrians. At this point, without any warning of danger, plaintiff stepped into the unguarded hole....

To establish the location of the hole, the City relied on the deposition testimony of appellant's expert, John Rekus. He determined that the hole, which measured "19 by 19 by 41 inches deep," was located in a "grassy median strip" in the Park, "between the sidewalk and the basketball court." Rekus noted that the basketball court is located "to the east" of the hole, and the hole was approximately "five or six feet" east of the sidewalk. According to Rekus, the hole was in an area where "people would be walking," "[w]alking their pets, [and] playing with their children."

Although it is not clear when Rekus visited the site, he stated that, when he went to the Park after the accident, the cover for the pit was at the bottom of the hole, resting on top of "rubbish." Moreover, he opined that a "supporting lip" at one time "supported the cover," but it had "broken away and it was no longer able to support the cover." Based on the presence of rust, Rekus estimated that the supporting lip broke "a number of weeks or months" before he assessed the location.

Rekus took "many pictures" of the site, which appellee submitted as exhibits. The photographs show that the pit is located within a grassy area adjacent to the sidewalk. The grassy area is several feet wide, and is bounded on one side by a chain link fence that encloses a basketball court and on the other side by the sidewalk. The cement pit appears to be a few feet from the edge of the sidewalk.

In his affidavit, Buddemeyer, the City surveyor, agreed that the hole "was located in a grassy area on the east side of Johnson Street opposite East Barney Street." Similarly, Jones, who drafted a plat, stated that "the hole is located in

Riverside Park, the edge of which is 3.6 feet east of the property line, also known as the Right of Way Line of Johnson Street."

In her opposition, appellant asserted that "[t]he City had notice of the hole, control over its condition, and the duty, opportunity and means to fill it." She insisted that "[t]he hole, which remained after an electrical transformer was removed, was known to exist by the City a long time before the plaintiff was injured." In her view, the length of time that the hole remained uncovered was a "triable" issue.

With her opposition, appellant submitted numerous exhibits, some of which were already submitted by the City. In addition, she included portions of the depositions of Blaine Lipski, taken on April 7, 2004; Anthony P. Wallnofer, Jr., taken on April 7, 2004; Phillip Buddemeyer, taken on April 13, 2004; and James Brown, taken on April 7, 2004.

Lipski, an employee of the City's Department of Public Works ("DPW"), stated at his deposition that the "hole was apparently the abandoned base of a former electrical transformer...." He explained that when he saw the hole in July 2003, he noted that it "was a former source of electric for the park," because "[t]here was a conduit sticking out of the base of the lower part of the hole." At that time, he "notified Rec and Parks to take appropriate action." Lipski testified: "Upon my direction I had them fill the hole in"; it was filled "[t]hat afternoon prior to my departure." [1]

Similarly, Wallnofer, a "Dept. [of] Transportation employee," testified at his deposition that the hole "may have been the base to a transformer of some sort." He examined a photograph of the hole and observed "a piece of lead cable

1. It is undisputed that, at the latest, the City was placed on notice of the hole by appellant within 180 days of the incident on February 12, 2000, pursuant to the Local Government Tort Claims Act, Md.Code (2002 Repl.Vol.), Cts. & Jud. Proc. Art. § 5–304(a). It is almost inconceivable that, despite such notice, and given the location of the hazard across the street from the NFB, the pit remained unrepaired for almost three years.

maybe in the bottom, which is an indication that it may have served an electrical function."

At his deposition, Buddemeyer stated that a 1964 survey of the Park included "this hole.... This is ... exactly the same hole." On May 24, 2004, however, the City filed a "Line," attaching a second Affidavit of Buddemeyer. In his second affidavit, Buddemeyer sought to correct his deposition testimony regarding "the 1964 Field Survey Notes" of the location of the hole. He stated that he believed the "notes indicate that the area in question was noted as a concrete base for an unknown utility. However, there is no notation indicating that area to be a hole."

Further, appellant claimed that, "[d]uring the three or four years prior to the time the plaintiff was injured, City employees regularly mowed the grass in the area, and picked up trash there," and, "of necessity," they would have seen the "deteriorated condition" of the hole. She averred that DPW employees "had the responsibility to report hazards of this nature orally to their supervisor and the supervisor had both the responsibility and the authority to get it filled."

In this regard, the following deposition testimony of Wallnofer is pertinent:

[APPELLANT'S COUNSEL]: If an employee going about the course of his duties cutting the grass saw what he considered to be a hazard to the public, namely an uncovered manhole, what responsibilities would he have to report that fact?

[MR. WALLNOFER]: I would have expected them to report that.

[APPELLANT'S COUNSEL]: To whom would ... the grass cutting employee report it?

[MR. WALLNOFER]: Probably to their immediate supervisor.

[APPELLANT'S COUNSEL]: Their immediate supervisor, would he be working in the same park or would he be somewhere else?

[MR. WALLNOFER]: He would be working in general in the same park.

[APPELLANT'S COUNSEL]: And what would then the immediate supervisor do with that information?

\* \* \*

[MR. WALLNOFER]: I would hope that they would make it safe by whatever means they saw adequate or appropriate.

[APPELLANT'S COUNSEL]: Are you saying that a supervisor of the sort you're talking about could on his own authority have had the hole filled with aggregate, for example?

[MR. WALLNOFER]: Yes.

[APPELLANT'S COUNSEL]: Did you, are you aware of any complaints from members of the public or employees about this hole prior to February 2001?

[MR. WALLNOFER]: No, sir.

James Brown, a "Park Maintenance Supervisor," testified that, when he supervised employees who cut grass for City parks, they were supposed to report a hazardous condition directly to him. But, like Wallnofer, Brown denied that any employee ever notified him about the hole in the Park.

In addition, appellant argued that N.R. § 5–1103 was inapplicable because the version of the statute in effect on February 12, 2000, limited recreational uses to "items listed as being of recreational purpose. . . ." According to appellant, "[p]ermitting a service animal to relieve itself is not listed as a recreational pursuit."

Further, appellant contended that the City was not protected by "sovereign immunity." She asserted, in part:

Municipalities have an historic, clear duty to exercise reasonable and ordinary care in maintaining their streets and sidewalk areas, *as well as the areas adjacent thereto*, as they do in carrying out other private, proprietary functions. The negligent failure to do so, whether or not those adjacent areas are technically located within the surveyed boundaries

of a park, is actionable. Moreover, there is no immunity for maintaining a nuisance.

In further support of her position, appellant observed that the hole "had no recreational use," and the area where it was located did not serve the governmental function of the Park. To the contrary, asserted Whalen, the City had a proprietary duty to maintain the area in question. She argued:

> [T]he injuries at issue did not occur in the playground area, or in relationship to the City's exercise of some other governmental function, but to the maintenance of a well-recognized, private, proprietary obligation of the municipality to maintain a public way, and the areas adjacent thereto, and to remove nuisances affecting the use and safety of same. Plaintiff obviously fell into an abandoned, neglected utility hole located *outside* of the playground. The area where plaintiff fell was routinely mowed as part of the public thoroughfare and City employees had had many opportunities to observe the hole and had [the] responsibility to take action in response to it. The public thoroughfare and adjacent area, as described in the complaint, includes the cement sidewalk, the adjacent street, and the nearby pedestrian crosswalk. It also includes the strip of land between the City's sidewalk and the fence which surrounds the public playground-that strip of land between the perimeter of the park, to be sure, but is nevertheless *contiguous* to the public right of way.

(Emphasis in original).

The summary judgment motion was heard on June 9, 2004. On that date, the court issued an "Order" granting the City's motion, "for the reasons enumerated" in court. However, no transcript is available containing the "enumerated" reasons, because the court reporter lost her notes from the hearing.[2]

We shall include additional facts in our discussion.

---

2. After the appeal was noted, appellant submitted a "Motion to Extend Time for Transmittal of the Record." In her motion, appellant averred that she was unable to obtain a "transcript of the proceeding relevant to

## DISCUSSION

### I.

Unfortunately, we have neither a transcript of the proceedings with an oral ruling, nor a written opinion from the judge below. But, the parties agree that the circuit court did not award summary judgment to the City based on statutory immunity. And, while they are uncertain as to the trial court's disposition of the notice issue, they agree that the court granted summary judgment based on sovereign or governmental immunity. Therefore, the parties ask us to consider the issues of sovereign or governmental immunity and notice.

It is well settled that, " '[i]n appeals from grants of summary judgment, Maryland appellate courts, as a general rule, will consider only the grounds upon which the [trial] court relied in granting summary judgment.' " *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726 (2001) (quoting *PaineWebber v. East,* 363 Md. 408, 422, 768 A.2d 1029 (2001)). In general, we do not " 'speculate' " as to the trial judge's reasoning. *Lovelace,* 366 Md. at 695, 785 A.2d 726 (quoting *Gresser v. Anne Arundel County,* 349 Md. 542, 552, 709 A.2d 740 (1998)). *See also Ross v. Am. Iron Works,* 153 Md.App. 1, 9–10, 834 A.2d 962 (2003), *cert. denied,* 379 Md. 226, 841 A.2d 340 (2004). Because the parties agree as to the grounds on which the circuit court ruled, and jointly ask us to consider those grounds, we shall limit our review accordingly.

In undertaking our review as to the issues of governmental immunity and notice, we are mindful that Md. Rule 2–501 establishes a two-part test for summary judgment: the

---

the appeal. . . ." Appellant explained that, according to the Chief Court Reporter, "the transcription has been delayed because of some confusion over the identity of the court reporter responsible for providing it." A few weeks later, appellant filed a "Second Motion to Extend Time for Transmittal of the Record." Appellant included a letter dated October 27, 2004, from the court reporter responsible for providing the transcript, who explained that she was "unable to locate [her] notes for the date of this case."

trial court must decide whether there is any genuine dispute as to material facts and, if not, whether either party is entitled to judgment as a matter of law. *Johnson v. Mayor & City Council of Balt. City*, 387 Md. 1, 5, 874 A.2d 439 (2005); *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14, 852 A.2d 98 (2004). A material fact is one that will affect the outcome of the case, depending upon how the factfinder resolves the dispute. *Arroyo v. Bd. of Educ. of Howard County*, 381 Md. 646, 654, 851 A.2d 576 (2004); *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *Mandl v. Bailey*, 159 Md.App. 64, 82, 858 A.2d 508 (2004).

The movant has the burden with respect to a summary judgment motion. *See Nerenberg v. Rica of S. Md.*, 131 Md.App. 646, 660, 750 A.2d 655, *cert. denied*, 360 Md. 275, 757 A.2d 810 (2000). To defeat summary judgment, the party opposing the motion must produce evidence demonstrating a genuine dispute of material fact. *Scroggins v. Dahne*, 335 Md. 688, 691, 645 A.2d 1160 (1994); *Berringer v. Steele*, 133 Md.App. 442, 470, 758 A.2d 574 (2000). This means that the nonmoving party must convince the court with facts "in detail and with precision." *Phila. Indem. Ins. Co. v. Md. Yacht Club, Inc.*, 129 Md.App. 455, 465, 742 A.2d 79 (1999) (internal quotation marks omitted). Mere general allegations or conclusory assertions will not suffice. *Beatty v. Trailmaster Products, Inc.*, 330 Md. 726, 738, 625 A.2d 1005 (1993).

Notably, the Court of Appeals has cautioned: "The hearing on a motion for summary judgment is not to determine disputed facts but to determine whether there are disputed [material] facts." *Jones v. Mid–Atl. Funding Co.*, 362 Md. 661, 675–76, 766 A.2d 617 (2001). Moreover, all factual disputes, and reasonable inferences drawn from the facts, are resolved in favor of the nonmoving party. *Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners*, 380 Md. 106, 114, 843 A.2d 865 (2004); *Frederick Rd. Ltd. P'Ship v. Brown & Sturm*, 360 Md. 76, 94, 756 A.2d 963 (2000). And, in resolving the motion, the trial court may not determine the credibility of witnesses. *Thacker v. City of Hyattsville*, 135

Md.App. 268, 286, 762 A.2d 172 (2000), *cert. denied,* 363 Md. 206, 768 A.2d 55 (2001).

An order granting summary judgment is reviewed *de novo. Beyer v. Morgan State Univ.,* 369 Md. 335, 359, 800 A.2d 707 (2002). Like the trial court, we must make "the threshold determination as to whether a genuine dispute of material fact exists." *Remsburg v. Montgomery,* 376 Md. 568, 579, 831 A.2d 18 (2003). If we are satisfied that no genuine issue of material fact was raised or identified in the proceedings below, then we must determine if the trial court "reached the correct legal result." *Crews v. Hollenbach,* 126 Md.App. 609, 625, 730 A.2d 742 (1999) (internal quotation marks omitted), *aff'd,* 358 Md. 627, 751 A.2d 481 (2000); *see Arroyo,* 381 Md. at 654, 851 A.2d 576; *Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 204, 680 A.2d 1067 (1996). " 'The standard of appellate review, therefore, is whether the trial court was legally correct.' " *Williams v. Mayor & City Council of Balt.,* 359 Md. 101, 114, 753 A.2d 41 (2000) (citation omitted).

## II.

It is undisputed that the incident occurred within the geographic boundaries of the Park, and that the Park is owned and operated by the City. On that basis, the City urges us to uphold the ruling of the court below, concluding that it is protected by governmental immunity.

Looking largely at the proximity of the hole to the public sidewalk, and the particular use of that grassy area, appellant argues that the location of the pit within the confines of the Park is not controlling as to immunity. Claiming that "the hole and the strip of grass exterior to the fence," where the accident occurred, were part of a "public thoroughfare," appellant relies on the principle that a municipality has a proprietary obligation to persons "lawfully using its public streets and sidewalks to make them reasonably safe for passage." According to Whalen, the public thoroughfare included "Johnson Street, the crosswalk which bisects it, the cement sidewalk it

meets on the eastern side, and a strip of grass [in the Park] extending beyond that sidewalk."

According to appellant, the open hole constituted a "nuisance." And, because appellant was not injured "in the playground area, or in some other part of a park bearing a relationship to the city's exercise of a governmental function, but immediately adjacent to the public right of way," she argues that the doctrine of governmental immunity is inapplicable.

The City acknowledges that, "[u]nlike the absolute immunity from tort liability afforded to the State and its agencies, the immunity of counties, municipalities, and their agencies is limited to alleged tortious conduct arising out of governmental, rather than proprietary, functions." But, it insists that the operation and maintenance of a public park is inherently a governmental function. Therefore, it contends that it "cannot be found liable for Appellant's injuries."

In support of its reliance on governmental immunity, the City asserts that the "operation of the park was not directed toward the private, corporate interests of the City of Baltimore, but rather toward the health, welfare and recreation of the public." The City notes: "It is beyond doubt that it is in the public interest to have City sponsored parks and places of recreation, education, and culture for the public at large." Moreover, appellee maintains that appellant was "not utilizing the sidewalk alongside the park nor was she traversing the park to travel from one public sidewalk to another." Instead, says the City, Whalen "went to the park specifically for a recreational purpose, albeit one of necessity." The City adds: "The mere fact that the appellant was visually impaired does not make the use any less recreational."

As the Court of Appeals explained in *Hous. Auth. of Balt. City v. Bennett*, 359 Md. 356, 358, 754 A.2d 367 (2000), "[u]ntil the twentieth century, local governments generally had no immunity under Maryland common law in either tort or contract actions." *See also Rios v. Montgomery County*, 157 Md.App. 462, 475, 852 A.2d 1005, *aff'd*, 386 Md. 104, 124, 872

A.2d 1 (2005). In the early twentieth century, however, the Court of Appeals recognized that local governments had "immunity in certain types of tort actions based on activity categorized as 'governmental' but had no immunity in tort actions based on activity categorized as 'private' or 'corporate' or 'proprietary.' " *Bennett,* 359 Md. at 359, 754 A.2d 367.

■ Thus, "shaped largely by judicial decisions and by statutes dealing with specific agencies or specific matters," *id.* at 358, 754 A.2d 367, local governments have enjoyed limited immunity from tort liability, but only for "nonconstitutional torts based on activity categorized as 'governmental.' " *Id.* at 361, 754 A.2d 367. *See, e.g., DiPino v. Davis,* 354 Md. 18, 47, 729 A.2d 354 (1999) ("A local governmental entity is liable for its torts if the tortious conduct occurs while the entity is acting in a private or proprietary capacity, but, unless its immunity is legislatively waived, it is immune from liability for tortious conduct committed while the entity is acting in a governmental capacity."); *Balt. Police Dep't v. Cherkes,* 140 Md.App. 282, 314, 780 A.2d 410 (2001)(stating that "local governmental bodies have common law governmental immunity only for acts that are governmental, and not for private or proprietary acts, and they do not have immunity from liability for State constitutional torts"); *see also Harford County v. Town of Bel Air,* 348 Md. 363, 373, 704 A.2d 421 (1998); *Ashton v. Brown,* 339 Md. 70, 101, 660 A.2d 447 (1995).

■ The governmental immunity enjoyed by counties and municipalities derives from the State's sovereign immunity. *See Bd. of Educ. of Prince George's County v. Mayor & Common Council of the Town of Riverdale,* 320 Md. 384, 390, 578 A.2d 207 (1990). Therefore, "[w]here a municipal corporation is performing a governmental function, it enjoys the same immunity as the state itself." *Higgins v. City of Rockville,* 86 Md.App. 670, 676, 587 A.2d 1168, *cert. denied,* 323 Md. 309, 593 A.2d 669 (1991). But, governmental immunity is "much narrower than the immunity of the State." *Town of Riverdale,* 320 Md. at 390, 578 A.2d 207. Consequently, as we have seen, a municipality is not immune from a tort suit if the

conduct in issue was committed in the municipality's proprietary capacity. *Md.-Nat'l Capital Park & Planning Comm'n. v. Kranz,* 308 Md. 618, 622, 521 A.2d 729 (1987); *Burns v. Mayor & City Council of Rockville,* 71 Md.App. 293, 297–98, 525 A.2d 255 (1987).

These countervailing principles, recognizing immunity for governmental functions but no immunity for propriety ones, are "too firmly embedded in our law to be disturbed now." *Mayor & City Council of Balt. v. State,* 173 Md. 267, 273, 195 A. 571 (1937). In *Blueford,* 173 Md. at 271–72, 195 A. 571, the Court explained:

> Where ... a municipality is engaged in the performance of a governmental function as an agent of the state, the same principle which protects the state from liability also protects the municipality. So that, where that principle of immunity is invoked in behalf of a municipality charged with a tort, the primary and essential inquiry is whether the tortious act was done in the course of the performance of some governmental duty or function.

Often, the more difficult question involves the determination of whether the particular acts of a municipality were governmental or proprietary. The *Blueford* Court elucidated that issue, *id.* at 276, 195 A. 571:

> Where the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the public health and promote the welfare of the whole public, and has in it no element of private interest, it is governmental in its nature.

To be sure, a municipality's operation and maintenance of a public park is generally regarded as a governmental function. As a result, a municipality ordinarily is not liable for neglect in regard to the maintenance or management of a public park. *Blueford,* 173 Md. at 272, 195 A. 571; *Mayor & City Council of Balt. v. State, Use of Ahrens,* 168 Md. 619, 179 A. 169 (1935). *Ahrens* illustrates this proposition.

In *Ahrens,* the Court held that the City of Baltimore was not liable for the drowning death of a boy at Gwynns Fall Park, because the maintenance and operation of the park was a governmental function. The Court explained, 168 Md. at 628, 179 A. 169:

> In these days of advanced civilization, in a period when the unfortunate tendency of many is to abandon the countryside—the haunts of their own youth—and thereby add to the already over congested metropolitan areas, public city parks are almost as necessary for the preservation of the public health as is pure water.
>
> \* \* \*
>
> In a word, to hold municipalities liable in damages, under circumstances such as are revealed in the instant case, would be against public policy, because it would retard the expansion and development of parking systems, in and around our growing cities, and stifle a gratuitous governmental activity vitally necessary to the health, contentment, and happiness of their inhabitants.
>
> Our conclusion, therefore, is that the maintenance, control, and operation of Gwynns Falls Park, by the appellant, is a governmental duty, discretionary in its nature, performed in its political and governmental capacity as an agency of the State.

*See also Austin v. Mayor & City Council of Balt.,* 286 Md. 51, 405 A.2d 255 (1979) (holding that where City subsidized the operation of a day camp, and the operation was authorized by City Charter provisions pertaining to department of recreation, the operation of the day camp was governmental); *Blueford,* 173 Md. at 272, 195 A. 571 (concluding that "the maintenance of a public park is a governmental function, and . . . the municipality is not liable for any default or neglect of its agents or employees in the management thereof").

It is equally clear, however, under "the indisputable and long-settled law of this state," *Higgins,* 86 Md.App. at 678, 587 A.2d 1168, that a municipality has a " 'private proprietary obligation' " to maintain, in a reasonably safe condition,

its streets, sidewalks, and areas contiguous to them. *Id.* at 679, 587 A.2d 1168; *see Pierce v. Mayor & City Council of Balt.*, 220 Md. 286, 290, 151 A.2d 915 (1959). Therefore, "[i]t has long been held that a municipality is not immune from a negligence action arising out of its maintenance of its public streets and highways." *Higgins,* 86 Md.App. at 678, 587 A.2d 1168.

As we outlined, appellant suggests that, for all practical purposes, the "true boundary" of the Park was the fence surrounding the basketball court, and not the area outside the fence where the hole was located. Because the hole was located in a "narrow strip of grass" that was contiguous to the public sidewalk, which was itself next to the public street, Whalen insists that the City is not protected by governmental immunity. Conversely, the City insists that because the accident occurred within the Park's geographic boundaries, governmental immunity applies. The question, then, is whether the existence of the hole within the physical boundaries of the Park compels the application of governmental immunity as a matter of law, even though the hole was situated in a grassy area that may have served a dual purpose: it was close to a public sidewalk which, in turn, abutted a public street, and it was also inside the Park. Several cases guide our analysis.

We begin with a review of *Mayor & City Council of Balt. v. Eagers,* 167 Md. 128, 173 A. 56 (1934). In that case, the decedent was fatally injured while walking on a sidewalk that formed part of the perimeter of a public square. On the day of the incident, several laborers, who were "employees of the municipal bureau of highways working in its city forestry division," *id.* at 132, 173 A. 56, were engaged in removing some of the trees in the square. *Id.* at 130, 173 A. 56. As the laborers attempted to pull down a tree, a rotten limb snapped off and fell on the victim. *Id.* At the time, the decedent "was walking ... on the center of the sidewalk whose nearer margin was twenty feet east of the trunk of the tree." *Id.*

The Court agreed that, "[i]f the neglect or wrongful act was in the course of the performance of a purely governmental

duty which had been imposed upon the municipality . . . there would be no liability in tort in favor of an individual who had been injured." *Id.* at 135, 173 A. 56. But, it rejected the City's argument that "the accident occurred during the course of the performance of a governmental function for which the municipality was not liable to respond in damages." *Id.* at 129, 173 A. 56. Mindful of a municipality's proprietary function to keep streets safe for travel, the Court concluded that such a duty "extends to the land immediately *contiguous to these public ways.*" *Id.* at 136, 173 A. 56 (emphasis added).

 Of import here, the Court acknowledged that "[i]t is often difficult to determine in a particular instance whether the duty involved is in the exercise or neglect of the municipality's governmental or political functions or of its ministerial and private or corporate functions." *Id.* The Court explained, *id.:*

> The decisions do not furnish a satisfactory test, as they are conflicting in their reasoning and conclusions. In the case at bar the problem concerns not only the beauty, utility, and safe enjoyment by the public of the square but also the safety of the use of a public way through a square of a municipal corporation. *There is no question that, by the great weight of authority, the rule of law is that it is a private proprietary obligation of municipal corporations to keep their streets and public ways reasonably safe for travel in the ordinary manner,* and to prevent and remove a nuisance affecting the use and safety of these public ways. This rule is founded on the principles of agency and torts. . . .
>
> *The duty to keep the streets and footways of the municipality in a safe condition for public travel, and to prevent and remove a nuisance affecting the use and safety of these public ways, extends to the land immediately contiguous to these public ways. Infra. A fortiori* is it the duty of the municipality not to have or to suffer its agents and servants to create the danger on the public way of the municipality

whereby the party was injured without any fault on his part directly contributing.

(Emphasis added).

*Haley v. Mayor & City Council of Balt.,* 211 Md. 269, 127 A.2d 371 (1956), is also noteworthy. In *Haley,* the plaintiffs were injured in separate accidents "while descending a column of concrete steps located in Preston Gardens, a public park in the City of Baltimore." *Id.* at 271, 127 A.2d 371. The stairs "were part of a concrete walk connecting two intersections" in downtown Baltimore. *Id.* In particular, the concrete walk and the concrete steps "constitute[d] a straight and direct connecting link between the sidewalks on Franklin Street east and west of St. Paul Place and St. Paul Street." *Id.* at 272, 127 A.2d 371. The circuit court granted summary judgment to the City.

On appeal, the Court considered "whether, under the facts before us, the maintenance of these concrete steps leading through . . . a public park, is a governmental function or a corporate function." *Id.* at 272, 127 A.2d 371. Significantly, the Court said: "The mere physical location of the passageway within the park does not of itself decide the function. *The use of a particular facility is a determining factor."* *Id.* The Court determined that the maintenance of the steps within the public park was a proprietary function, and thus the City could be held liable for injuries sustained by pedestrians who fell there if its negligence was established. The Court explained, *id.* at 272–73, 127 A.2d 371:

> The law of this State is well established that a municipal corporation is not liable in a civil action for any default or neglect in the performance of a purely governmental function, such as the maintenance and management of a public park for recreational purposes. On the other hand, the keeping of public highways and walkways under its management and control in a reasonably safe condition is a corporate function of a municipality and it is therefore answerable in damages for failing to exercise such function.

In the case at bar *the appellants were using the steps as part of the public highway in order to travel between points which were outside the park and not for recreational purposes.* It is stipulated that numerous persons use these steps and walkways to travel from St. Paul Street to St. Paul Place and *vice versa.* In such circumstances we think that the steps constitute a public highway of the City, that it is immaterial which department of the City is charged with their maintenance, and that *City of Baltimore v. Eagers, supra,* is controlling.

(Internal citations omitted) (emphasis added).

The Court concluded, *id.* at 274, 127 A.2d 371:

The decision of the trial judge was based solely upon the ground that the City was entitled to judgment because the maintenance and operation of the park involved the exercise of a governmental function for which the City could not be held liable. Since we think that the steps in question constituted a part of a highway for the negligent maintenance of which the City may be held liable, the judgments for the City will be reversed and because there seems to be a dispute as to the existence of negligence on the part of the City, each of the cases will be remanded for a new trial.

*Pierce, supra,* 220 Md. at 286, 151 A.2d 915, is also pertinent. In that case, the plaintiff brought an action against the City for injuries he sustained when he fell on a strip of land adjacent to a City street. *Id.* at 288, 151 A.2d 915. The plaintiff, not wanting to walk in the street, and finding no sidewalk, decided to walk on an "unpaved strip of ground" that paralleled the street. *Id.* Along the way, he caught his foot "under a metal plate covering a drain and fell." *Id.* After the jury found for the plaintiff, the trial court set aside the verdict based on contributory negligence. *Id.*

On appeal, citing *Eagers,* the Court reiterated that "a municipality has a duty to maintain streets, sidewalks, and footways, *and the areas contiguous to them,* in a reasonably safe condition." *Id.* at 290, 151 A.2d 915 (emphasis added). Notably, the Court added: "If . . . the obstruction or defect is

not to be expected and is substantial, and the municipality has actual or constructive notice of it, generally recovery is allowed, even though the area involved is one not actually or formally dedicated to pedestrian use." *Id.* at 291, 151 A.2d 915.

Of significance here, the Court determined, *id.:*

[T]he jury properly could have concluded that the City had violated a duty owed Pierce to have anticipated that pedestrians would not walk in the street with their backs to traffic, but rather accept the invitation offered by the circumstances and environment to walk on the strip on which Pierce walked, and that one so walking might injure himself on the drain or the plate.

Accordingly, the Court concluded: "Although the amount of care required of the City was not as great in the area involved as it would have been as to a paved sidewalk or a street, nevertheless, the defective condition of the drain was more than slight or trivial and, indeed, almost amounted to a trap." *Id.* at 292, 151 A.2d 915.

We are also guided by this Court's decision in *Higgins, supra,* 86 Md.App. 670, 587 A.2d 1168. It teaches that, even if an area is within the confines of a park, the use and maintenance of the area may be part of a municipality's proprietary responsibility.

In *Higgins,* a pedestrian was seriously injured when, at night, he tripped over a "cable gate" [3] on a service driveway that led to an athletic field at a site that once was a county school. *Id.* at 674, 587 A.2d 1168. The plaintiff went to the site to attend an athletic event, and the driveway was the "primary route" to the field. *Id.* Both the driveway and the field were maintained by the City of Rockville. Higgins sued the City of Rockville and others, alleging negligence in failing to provide a safe walkway and in failing to warn of the danger. *Id.* at 675, 587 A.2d 1168.

---

**3.** We explained in *Higgins,* 86 Md.App. at 674, 587 A.2d 1168: "The object causing the fall was a chain or cable (cable gate), approximately 10 feet in length, strung between two posts, or bollards, with white tubing covering the middle section."

At trial, the evidence showed that "[t]he driveway was used by 'voters dropping off their ballots,'[1] waste trucks picking up trash dumpsters, and other maintenance vehicles." *Id.* at 673–74, 587 A.2d 1168. Described as a " 'service access' " road, *id.* at 685, 587 A.2d 1168, it was also used by "pedestrians for various purposes, but primarily for access to the athletic fields" located in the rear. *Id.* at 674, 587 A.2d 1168. At the close of the pedestrian's case, the circuit court granted the defendants' motion for judgment on the grounds that "a *prima facie* case of negligence had not been established, that Higgins was contributorially negligent as a matter of law, and that [the City] enjoyed governmental immunity." *Id.* at 675, 587 A.2d 1168.

On appeal, Higgins argued that the City of Rockville was not protected from liability based on governmental immunity. In his view, Rockville was engaged in a proprietary function of maintaining streets and walkways when its agents negligently "stretched the cable gate across the width of the driveway leading to the park. . . ." *Higgins,* 86 Md.App. at 678, 587 A.2d 1168. This Court agreed.

Writing for the Court, Judge Moylan considered the circumstance, arguably present here, when a single site serves a dual purpose, one of which appears to be governmental and the other proprietary. He stated, *id.* at 680, 587 A.2d 1168:

The neat distinction between a governmental function and a proprietary function—between immunity and liability—loses its clarity . . . when applied to a hybrid function. What happens when a public roadway or public walkway (proprietary) goes through or simply into a park or other recreational area (governmental)? Is a centaur more like a man or more like a horse?

The *Higgins* Court indicated that Rockville's liability did not depend on the particular use of the driveway at a given time. Recognizing the difficulties attendant to the analysis of a hybrid site, the Court said, *id.* at 684, 587 A.2d 1168:

[I]f the City of Rockville were negligent in its installation of the bollards and cable gate, would it be liable to suit by a

pedestrian who tripped over the cable gate while delivering ballots to the rear door of the school building but immune from suit by another pedestrian who simultaneously tripped over the same cable gate while bound for the softball field? Further, the Court reasoned, *id.* at 685–86, 587 A.2d 1168:

The responsibility of the City of Rockville ... for the maintenance of the parking lot and driveways on the campus of the former ... Junior High School is precisely what it would have been, had the ... Athletic Park never existed.... Evidence at trial showed that waste trucks, maintenance vehicles and voters dropping off their ballots regularly use the driveway. The driveway was a place the City was proprietorially obligated to maintain "in a reasonably safe condition...."

Clearly, the City would have been liable to suit if its negligent maintenance of the driveway had led to the injury of the truck drivers who used it to pick up trash and garbage from the rear of the school, of the operators of the maintenance vehicles who used it regularly to service the area or of the voters who used it to drop off their ballots at the school. *To the extent to which it was used as a pedestrian walkway as well as a vehicular driveway, the City would have been liable for any negligent maintenance that caused injury to those pedestrians.* Once it is established that it was part of the proprietary responsibility of the City to maintain the driveway in a safe condition, the liability of the City was not contingent upon whether the injured pedestrians and/or motorists were bound for the rear of the school or were bound for the playing fields.

Therefore, the Court rejected the trial court's conclusion that the City was engaged in a governmental function with regard to the cable gate, merely because the pedestrian happened to be "bound for the athletic field." *Id.* at 684, 587 A.2d 1168. It explained, *id.* at 685, 587 A.2d 1168:

The [City] and the trial judge have extrapolated too facilely from the inferential significance of a recreational use of a public way within a park to an hypothesized similar signifi-

cance when the public way is not within a park (albeit close to and approaching the park). In the first setting, the park is a place wherein governmental immunity presumptively exists. The maintenance of a public way *through* the park, however, involves an exemption from that immunity. A showing that the public way is used for a recreational purpose rather than for through-transit is, in turn, an effort to ward off that exemption and preserve the original immunity. This very specialized doctrinal thrust-and-parry cannot be transferred from one context (park land) to a very different context (the world outside the park).

In its analysis, the *Higgins* Court discussed *Eagers*. It observed that the *Eagers* Court "attached no significance to (indeed, never alluded to) the possibility that the fatally injured pedestrian may have been in transit through the square rather than walking into the square simply to enjoy its amenities." *Higgins*, 86 Md.App. at 682, 587 A.2d 1168.

In its discussion of *Haley*, the *Higgins* Court said:

The implication is too strong to ignore. It is, however, difficult to appreciate fully the limits of its logic. Does it suggest that the maintenance of those very steps would have been transformed from something proprietary in nature to something governmental in nature if an alternative and more direct pedestrian route had been available that did not pass through the park? In laying out roadways and walkways through parks, are straight lines more proprietary and meanders more governmental? In classifying the function of maintaining public passageways, does concern with efficiency make it more governmental? Is the maintenance of a walkway (or a roadway) that enters a park, meanders around it, and then leaves the park again by the original entrance necessarily a governmental function because the loop is not a conduit from A to B. . . .

It would seem that when the city creates (or fails to correct) a hazard, it is *ab initio* either immune from the consequences of its negligence or it is not. . . . *Haley*, however, would suggest that immunity might be contingent

upon the particular business of the particular pedestrian who happens to run afoul of the hazard. *Does one pedestrian stepping into an unanticipated pothole, create liability in the city because he is busily bound from West Franklin Street to East Franklin Street oblivious to the intervening charms of the Preston Gardens, whereas another pedestrian, stepping into the same pothole, is thwarted by sovereign immunity simply because she ambled into the Gardens to smell the flowers (thereby using the place "for recreational purposes")?* Can the nature of the City's responsibility turn upon the mere chance occurrence of who is injured by its failure to fulfill its responsibility.... *Haley* cannot mean what it seemed to say.

*Higgins,* 86 Md.App. at 683–84, 587 A.2d 1168 (emphasis added).

Other Maryland cases have also considered a municipality's obligation to maintain areas contiguous to streets and sidewalks. In the same year that *Eagers* was decided, the Court of Appeals decided *Mayor & City Council of Hagerstown v. Hertzler,* 167 Md. 518, 175 A. 447 (1934). In that case, the municipality was found liable at trial because a woman tripped over "a guy wire supporting a small tree in a grass strip between a paved sidewalk and the curb along one of the city streets." *Id.* at 519, 175 A. 447. According to the plaintiff, she tripped over the wire at night, when she walked from the street, over the grass median, to use the sidewalk. *Id.* at 520, 175 A. 447.

Recognizing the City's duty to keep the highway safe, the Court considered whether the adjoining grass strip between a road and a sidewalk was part of the highway. The Court said:

The strips are parts of the highway, although the rights and duties with respect to them are not the same as those with respect to the paved ways, laid out for traveling. Foot passengers are not excluded from them, unless, indeed, by some effectual withdrawal of the strips from use, either by fences or notices. When the strips are left open to them, the pedestrians are, as stated, bound to protect themselves

against any of the regular uses and obstructions, and comparative roughness of the ground; protection may be required of the municipality only beyond that point. *It is obliged to exercise care for safety of the pedestrians against dangers, not from the customary, permissible uses or conditions, but dangers of a kind that would not be expected by foot passengers, dangers in the nature of traps.* If the municipality should know of such dangers, or in the exercise of due care ought to know of them, it would be answerable to foot passengers who, though exercising due care on their own part, do not perceive the dangers. *So it has been held that the municipality must exercise care to protect against injury from unexpected obstructions, such as pipes or piles of stone on the ground, holes,* and wires fencing off seeded portions.

*Id.* at 520–21, 175 A. 447 (emphasis added).

The municipality denied liability because it lacked actual notice of the danger. Because the Court could not say that the matter would have "escaped the attention of officers exercising proper care," *id.* at 522, 175 A. 447, it determined that the issue was one for the jury to resolve.

*Birckhead v. Mayor & City Council of Balt.,* 174 Md. 32, 197 A. 615 (1938), is also pertinent. In that case, the plaintiff was a passenger in a vehicle that collided with "large stones alleged to have been negligently placed on the edge of the west side of a public driveway of the municipality in its public park." *Id.* at 33–34, 197 A. 615. While the vehicle occupied by the plaintiff was traveling northbound on Pimlico Drive, it encountered a driver approaching southbound in the northbound lane. To avoid colliding with the southbound vehicle, the driver of the plaintiff's vehicle swerved to the western side of the road and struck the large rocks sitting "in a line outside of, and parallel to, the western limit of the western shoulder of the improved roadway." *Id.* at 35, 197 A. 615. Upon impact, the plaintiff was "thrown violently forward in the automobile and there injured." *Id.* at 34, 197 A. 615.

After the trial court granted the defendant's demurrer, the plaintiff appealed. He argued that the municipality was liable for his injuries, but the Court of Appeals disagreed. At the outset of its analysis, the Court observed that, "[i]f the traveler goes outside of the bounds of the highway he cannot, as a general rule, recover of the municipality for injuries sustained as a result of a condition encountered beyond these limits." *Id.* at 36, 197 A. 615. Nevertheless, the Court stated:

> *The street or highway may, however, be unsafe for travel because of the presence in close proximity to its boundaries of dangerous excavations, declivities, embankments, deep water, or other perils. The dangers to travelers of such places, when near and so connected with the traveled part as to render the highway not reasonably safe for travel, cast upon the municipality the duty to provide suitable safeguards for the protection of the public in the use of the street or highway.* The risk to the traveler must, however, be such that he, while in the use of reasonable care in passing along the street or highway in an ordinary manner, may probably be injured by being thrown or falling into the dangerous place, unless a railing, barrier, or other safeguard make the way itself safe and convenient. The obligation is to safeguard the traveler from a danger of an unusual character.

*Id.* at 36–37, 197 A. 615 (emphasis added).

Because the driver left the road, the Court concluded that the municipality was not liable. Given that posture, the Court found it unnecessary to consider the City's argument that "the municipality is not liable because the construction and maintenance of the highways through the parks of the municipality are governmental functions." *Id.* at 40, 197 A. 615. It reasoned, *id.* at 38–40, 197 A. 615:

> The dangerous place or condition must be such as would create a reasonable probability of an accident thereby occurring to the traveler. "Ordinary care" is the measure of the duty required, and its exercise does not exact that the municipality guard against unusual or unforeseen accidents. No user of the highway described is in any peril from any

act or default of the municipality so long as the traveler keeps within the well defined limits of a wrought highway.... [T]here is nothing in the declaration which shows a situation that would cause the municipality to anticipate that any traveler would, in the exercise of due care, leave the bounds of a highway....

\* \* \*

The turning of his automobile to the left by the host of the plaintiff may have not been negligent because of the emergency, but, after turning to the left, the failure to keep within the limits of the highway was due to the driving of the host.... Hence, it cannot be maintained that negligence on the part of the municipal landowner existed because of the presence and location of the line of rocks on its premises near the highway but outside its limits....

■ We glean from the cases cited above that the situs of the accident within the confines of the Park does not compel the conclusion, as a matter of law, that the City was engaged in a governmental function. Here, it is undisputed that the pit or hole was located within the confines of the Park, but in a grassy area outside a fence and contiguous to the public sidewalk, which was outside the Park. Drawing from *Birckhead*, we cannot say that the municipality had no reason "to anticipate that any traveler would, in the exercise of due care, leave [the sidewalk]." 174 Md. at 38, 197 A. 615. And, as in *Pierce*, the pit "almost amounted to a trap," because of its proximity to the sidewalk and its location outside the enclosed, fenced area of the Park. *Pierce*, 220 Md. at 292, 151 A.2d 915. As Rekus stated, the hole was in an area where people walk, play, and walk their pets.

Indeed, appellant went to the Park to walk her service dog. She "stepped off the sidewalk onto the grassy area immediately adjacent to the sidewalk so as to permit the dog to scamper more freely in the grass...." Certainly, a jury could conclude that the area was prone to pedestrian travel, given its proximity to the public right of way outside the Park. For example, even while walking with an adult, a young child might stray

from the sidewalk onto the grass. Similarly, persons passing on the sidewalk at the same time might find it necessary to move from the sidewalk onto the adjoining grass. Or, someone traveling on the sidewalk while walking a dog could easily be pulled onto the grass by the pet.

In our view, the court erred in deciding, as a matter of law, that the City was engaged in a governmental function in connection with the maintenance of the grassy area. While the municipality's duty to maintain the Park is governmental, the City's maintenance of sidewalks, streets, and contiguous areas is a propriety function. Here, the grassy area adjacent to the sidewalk arguably served a dual purpose; a jury could reasonably conclude that someone on the sidewalk could meander off, without expecting to fall into an open pit.

### III. Actual or constructive notice

Even if the grassy area is deemed so close to a public walkway as to be part of it for purposes of the governmental/proprietary conundrum, the City contends that it is not liable because it had neither actual nor constructive notice of the danger. The City observes that "[t]here is absolutely no record or testimony evidencing that the City ever received a complaint or otherwise learned of the hole prior to the Appellant's accident." Moreover, the City points out that there is no evidence that "establishes when or how the hole developed," or "that the hole had existed for such a period of time that the City should have discovered it and had an opportunity to repair it."

Although appellant concedes that "no one has testified directly that they were personally aware of the hole prior to the time plaintiff fell into it," she asserts that, given the "plainly hazardous" condition of the hole, appellees "must be charged with knowledge." In addition, she contends that the City employees who regularly mowed the area knew or should have known of the hazard, and they "had a duty to report the hole and to get it filled in." Appellant argues that because the City "would have known of the bad condition of the hole by

the exercise of due care," it "had constructive knowledge" of the hole's existence.

To be sure, there is no evidence that the City had actual notice of the hole. Therefore, we turn to consider the issue of constructive notice.

In *Heron v. Strader*, 361 Md. 258, 761 A.2d 56 (2000), the Court stated:

> The law is established that a municipal corporation may be held liable for injuries caused by its negligence in failing to keep the streets and sidewalks under its control reasonably safe for travel in the ordinary manner, and in preventing and removing any nuisance affecting their use and safety. But a municipal corporation is not liable for injuries caused by the defective condition of a street, *unless it is shown that it had actual or constructive notice of such condition.* Constructive notice is such notice as the law imputes from the circumstances of the particular case.

*Id.* at 279–80, 761 A.2d 56 (emphasis added) (citations omitted). *Accord Neuenschwander v. Wash. Suburban Sanitary Comm'n,* 187 Md. 67, 72, 48 A.2d 593 (1946).

In *Mayor, Counselor & Aldermen of City of Annapolis v. Stallings,* 125 Md. 343, 344, 93 A. 974 (1915), a pedestrian brought an action against a municipality for injuries she sustained when she fell in a hole on a sidewalk. The plaintiff averred that the sidewalk " 'was permitted to remain for a long period of time out of repair....' " *Id.* Describing the condition of the hole, the Court stated, *id.* at 348–49, 93 A. 974:

> A number of witnesses testified as to the character and extent of the defect in the pavement. It was caused by the bricks becoming loose, and the children of the neighborhood digging the sand out to an extent that created a considerable hole in the sidewalk and rendered it dangerous to pedestrians. There is evidence to the effect that this hole remained in the sidewalk from March or April, 1910, until some time after the accident [in July 1910], and was readily observable by persons using the street and residing in the

neighborhood. The plaintiff testified that she had never been on this pavement until the night she was injured, and that she was unfamiliar with the sidewalk, and did not know of its defective condition. The street was rather dimly lighted at the time, and we do not find, in the testimony of the plaintiff or in the other evidence and circumstances, any such prominent and decisive act of negligence on the part of the plaintiff as would justify the court in holding, as a matter of law that she was guilty of contributory negligence.

██ The Court concluded that the evidence was sufficient to submit to the jury the issue of the City's negligent failure to discover and repair the defect in the sidewalk. *Id.* at 349, 93 A. 974. The Court explained:

After a street has been out of repair, so that the defect has become known and notorious to those traveling the street, and there has been full opportunity for the municipality through its agents charged with that duty, to learn of its existence and repair it, the law imputes to it notice and charges it with negligence. If the defect be of such a character as not to be readily observable, express notice to the municipality must be shown. But if it be one which the proper officers either had knowledge of, or by the exercise of reasonable care and diligence might have had knowledge of, in time to have remedied it, so as to prevent the injury complained of, then the municipality is liable.

*Id.* at 347, 93 A. 974 (internal quotation marks and citations omitted).

*Keen v. Mayor & City Council of Havre De Grace,* 93 Md. 34, 48 A. 444 (1901), is also informative. There, a pedestrian was injured when he fell into a hole on a City sidewalk. Concluding that the evidence of negligence was legally sufficient to submit the case to the jury, the Court said:

Before ... the municipality can be made liable in any case, it must be shown that it had actual or constructive notice of the bad condition of the street.... *"By constructive notice is meant such notice as the law imputes from the circumstances of the case. It is the duty of the municipal authori-*

*ties to exercise an active vigilance over the streets;* to see they are kept in a reasonably safe condition for public travel. They cannot fold their arms and shut their eyes and say they have no notice. After a street has been out of repair, so that the defect has become known and notorious to those traveling the streets, and there has been full opportunity for the municipality through its agents charged with that duty, to learn of its existence and repair it, the law imputes to it notice and charges it with negligence." If the defect be of such a character as not to be readily observable, express notice to the municipality must be shown.

*Id.* at 39, 48 A. 444 (citations omitted) (emphasis added).

Applying the principles set forth above to the facts of the case, the Court concluded, *id.* at 40, 48 A. 444:

[I]t is sufficient to state that divers witnesses testify to the existence and character of the hole. Mrs. Suter said she had seen it there for thee weeks before the accident; George Carroll, that it had been there, "maybe, a couple of weeks or so"; and John Suter, "two or three weeks." There is further proof that the hole was in the bed of the sidewalk, and not hidden or obscured by anything from the full view of any one who passed along that part of the walk. There was also evidence that the plaintiff passing there on a dark night, without knowledge of the defect, stepped into the hold, and "was thrown backward" and fell into the gutter, and thereby was injured. If the jury believed this testimony, they would unquestionably be justified in finding that the municipality was negligent in not repairing the defect, if it, or its proper officers or agents, knew of its existence; and if they did not have knowledge of its existence then they did not exercise that active vigilance which was incumbent on them, to see that the sidewalk was kept in a reasonably safe condition for public travel.

Our recent decision in *Smith v. City of Balt.*, 156 Md.App. 377, 846 A.2d 1121 (2004), is also illuminating. There, appellants "alleged that the City had breached its duty to use reasonable care in maintaining the pedestrian crossing signal

on the southwest corner of Fayette and Caroline Streets, and that, as a result, [the appellants' father] was fatally injured" when he was struck by an automobile while attempting to cross the street. *Id.* at 380–81, 846 A.2d 1121. Appellants conceded that the City did not have actual knowledge of the malfunctioning crossing signal, nor was there evidence as to how long the signal had been askew. *Id.* at 385, 846 A.2d 1121. Nevertheless, they maintained that, "because it was known to the City that pedestrian crossing signals sometimes become misaligned, the City was obligated to conduct routine inspections in an effort to discover those defects; and, in the absence of such inspections, the City should be deemed to have constructive knowledge of the defects." *Id.* After a hearing, the trial court granted summary judgment in favor of the City. We affirmed.

Of import here, this Court stated, *id.* at 386, 846 A.2d 1121:

Because a municipality has a duty to keep its roads in proper condition, it must perform repairs upon being notified of a "bad condition of the street." *Keen, supra,* 93 Md. at 39, 48 A. 444. Whether the municipality performs routine inspections or relies on citizens' reports to discover "bad conditions," it cannot avoid notice by turning a blind eye; therefore, when the evidence shows that a "bad condition" is such that, by virtue of its nature or the length of time it has existed, the municipality would have learned of it by the exercise of due care, the municipality may be found to have constructive knowledge of its existence.

Nevertheless, we suggested in *Smith, id.* at 385, 846 A.2d 1121, that the following statement in *Keen,* 93 Md. at 39, 48 A. 444, "cannot be read out of context."

[A] portion of [an] excerpt from *Keen* ... [states] that

[i]t is the duty of the municipal authorities to exercise an active vigilance over the streets; to see if they are kept in a reasonably safe condition for public travel. They cannot fold their arms and shut their eyes and say they have no notice.

The *Smith* Court explained, 156 Md.App. at 385, 846 A.2d 1121:

> [W]hen read in context [this excerpt] does not impose a duty on municipalities to conduct regular inspection of their roadways. Rather, the language explains the circumstances in which municipalities will be found to be on constructive notice of defects in their roadways, and the rationale underlying the concept of constructive notice.

The *Smith* Court concluded that a misaligned pedestrian crossing signal was not a defect of such a nature "that one reasonably could infer from its mere existence that citizens would have immediately reported it to the City authorities." *Id.* at 386, 846 A.2d 1121. Moreover, in contrast to the case *sub judice*, we pointed to the absence of direct or circumstantial evidence to show that the defect "existed for a sufficient length of time that it would have been reported to City authorities, and therefore would have been known to the City, had the City been abiding by its practice of responding to citizen reports of adverse roadway conditions." *Id.* Of import here, however, we said that, had there been evidence that the defect existed for a sufficient length of time so as to impute knowledge to the City, "the issue of constructive notice properly would have been for the fact-finder, precluding summary judgment." *Id.*

A quick glance at the photographs offered by the parties here suggests that the issue of constructive notice was a matter for resolution by the factfinder. The defect was plainly of such a character as to be "readily observable" during the day, except to blind persons. *Keen*, 93 Md. at 39, 48 A. 444. Moreover, the photographs give rise to an inference that the hole existed for a considerable period of time, so as to satisfy the requirement that the defect had been present long enough for the City "to learn of its existence and repair it." *Neuenschwander*, 187 Md. at 72, 48 A.2d 593. In addition, Rekus testified that the cover was not on the hole because of the deterioration of the lip, upon which the cover sat, which occurred over "a number of weeks or months."

On summary judgment, all reasonable inferences must be viewed in the light most favorable to the nonmoving party. In our view, appellant's evidence was sufficient to give rise to a reasonable inference that the defect was one of considerable duration.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEE.**